**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 9 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

COLORADO ENVIRONMENTAL COALITION;
DEFENDERS OF WILDLIFE; WILDERNESS SOCIETY;
SIERRA CLUB; SINAPU; SOUTHERN ROCKIES
ECOSYSTEM PROJECT; ANNE VICKERY,

      Plaintiffs-Appellants,

v.

MICHAEL DOMBECK, in his official capacity as Chief
of the United States Forest Service; LYLE K. LAVERTY,
in his official capacity as Regional Forester of the Rocky
Mountain Region; MARTHA KETTELE, in her official
capacity as Supervisor of the White River National Forest;
UNITED STATES FOREST SERVICE,

      Defendants-Appellees.

_____

VAIL ASSOCIATES, INC.,

      Intervenor-Appellee.

No. 98-1379

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 98-N-1276)**

---

Edward B. Zukoski (Richard E. Condit of Land and Water Fund of the Rockies,
Boulder, Colorado, and Stephen D. Harris of Merrill, Anderson, King & Harris,
Colorado Springs, Colorado, with him on the briefs for Colorado Environmental
Coalition, Defenders of Wildlife, The Wilderness Society, Sinapu, Southern
Rockies Ecosystem Project, and Anne Vickery; Gretchen Biggs, Boulder,

Colorado, with him on the briefs for Sierra Club), of Land and Water Fund of the Rockies, Boulder, Colorado, for Plaintiffs-Appellants.

Ellen J. Durkee of the United States Department of Justice, Washington, D.C., and David S. Neslin of Arnold & Porter, Denver, Colorado (Lois J. Schiffer, Assistant Attorney General, and Andrea Berlowe, United States Department of Justice, Washington, D.C.; Linda A. McMahan, United States Attorney, and Michael Hegarty, Assistant United States Attorney, Denver, Colorado, with them on the brief for Michael Dombeck, Lyle K. Laverty, and Martha Kettelle, in their official capacities, and the United States Forest Service; Peter Krumholz of Arnold & Porter, and Bruce F. Black of Holme Roberts & Owen LLP, Denver, Colorado, with them on the brief for Vail Associates, Inc.; and Kenneth Capps, United States Department of Agriculture, Of Counsel, Denver, Colorado, with them on the brief), for Defendants-Appellees and Intervenor-Appellee.

---

Before **SEYMOUR, BRORBY** and **HENRY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

Appellants, one individual and various groups that promote the protection of the environment, natural resources and wildlife, appeal a district court order refusing to enjoin the defendant, United States Forest Service ("Forest Service"), from permitting the Intervenor, Vail Associates, Inc. ("Vail"), to expand its existing ski area into a new area known as Category III. Appellants present two principal issues on appeal: (1) whether the Forest Service violated the National Forest Management Act, 16 U.S.C. § 1604(g)(3)(B), and its implementing regulations, 36 C.F.R. § 219.19, in analyzing the effects of the proposed ski area expansion on the viability of Canada lynx populations within the Category III

-2-

area; and (2) whether the Forest Service violated the National Environmental Policy Act, 42 U.S.C. § 4332, and its implementing regulations, 40 C.F.R. §§ 1500-1508, in analyzing the environmental impacts of the proposed expansion. Having carefully reviewed the administrative record, we conclude the Forest Service's lynx habitat analysis did not contravene the National Forest Management Act or the forest planning regulations. We further conclude the Forest Service's final environmental impact statement satisfied National Environmental Policy Act standards, and the Forest Service was not required to prepare a supplemental environmental impact statement. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1996, the Forest Service approved Vail's site-specific, detailed proposal to expand its existing ski area into roughly half of a 4,100 acre area south of the developed back bowls of Vail Mountain known as Category III. The Forest Service exercised jurisdiction over this matter because the existing ski area and the Category III area are within the White River National Forest. In approving the proposed expansion, the Forest Service concluded the expansion : (1) is consistent with the applicable Forest Plan; (2) will significantly improve the recreational experience for visitors to the Vail Ski Area and the White River National Forest by providing more reliable and dependable skiing conditions, and

by adding needed intermediate terrain; (3) will build skier visitation during non-peak periods, thus making more efficient use of existing infrastructure; and (4) as modified and restricted, will not threaten the viability of lynx, will have minor socioeconomic effects, and will have an acceptable level of impact on other resources.

By way of history we point out that Vail submitted a general expansion proposal in 1986. The Forest Service conceptually approved expansion into Category III and included that area in Vail's special use permit, designating it as a potential area for future ski area expansion, subject to subsequent site-specific environmental analysis.[1] The environmental assessment supporting the Forest Service's conceptual approval concluded it was unknown whether lynx use portions of Category III, but nevertheless treated them as a species of concern and required Vail to develop guidelines to protect potential lynx habitat.

---

[1] The Forest Service first contemplated an expansion into the Category III area as early as 1962, when it issued Vail's first special use permit. The 1983 and 1992 Rocky Mountain Regional Guides, which establish general policies and programmatic direction for ski area development in National Forests in Colorado and nearby states, likewise acknowledged the high priority for further development at Vail. Moreover, the 1984 White River National Forest Plan specifically designated the Category III area for ski development, and contemplated completion of such development by 1999.

Vail developed the lynx habitat guidelines in consultation with the Forest

Service and the Colorado Division of Wildlife.[2]  Vail also worked with the Forest

Service and Colorado Division of Wildlife to conduct over thirty specialized

resource studies on Category III, which it then utilized to prepare a detailed

development plan.  In order to preserve natural contours, avoid wetlands and old

growth forest, and protect potential habitat identified by those studies, Vail

eliminated plans for development in about half of Category III, and agreed to

maintain the ski area's existing capacity of 19,900 skiers-at-one-time.  Vail

submitted its site-specific, detailed development proposal to the Forest Service in

1994.

Upon receipt of Vail's site-specific proposal, the Forest Service initiated an

environmental review process as required by the National Environmental Policy

Act.  This process included a scoping period to identify issues for analysis and the

---

[2]  The guidelines specifically evaluated and discussed numerous aspects of lynx ecology and the impacts of proposed ski area expansion on lynx habitat.  In the discussion preceding the specific guidelines identified to mitigate such impacts, Vail and the federal and state agencies acknowledged it is preferable to develop a management plan with the specific knowledge that the species in question actually exists in or adjacent to the management area.  Nevertheless, they concluded that even if the species is absent, implementation of the guidelines "is prudent for maintaining adequate habitat, if and when the species reoccupies the area."

preparation of a biological evaluation and environmental impact statement.

Particularly relevant to this appeal, the biological evaluation and environmental

impact statement concluded that each expansion alternative considered may

adversely impact individual lynx and their habitat, but is unlikely to result in a

loss of species viability on the White River National Forest. Based on these

documents, in August 1996, the Forest Service published a Record of Decision

approving one of the expansion alternatives, as modified to minimize

environmental impacts.

A number of entities, including several of the Appellants, appealed that

decision to the Deputy Regional Forester, raising many of the same issues before

us. The Deputy Regional Forester denied the appeal, but directed the Forest

Service to prepare further documentation on potential cumulative impacts and

proposed forest plan amendments. The Forest Service conducted and documented

its further review, and again approved the modified expansion plan in August

1997. Expansion opponents filed another administrative appeal, which the Forest

Service denied.[3]

---

[3] Between 1986 and its approval of the expansion in 1997, the Forest Service conducted or considered over seventy different environmental studies on Category III and nearby areas; participated in over forty meetings with the general public, environmental groups and government agencies; formally consulted with seventeen federal, state and local agencies; and prepared an environmental

Appellants brought the present judicial action in June 1998, seeking a preliminary injunction enjoining the commencement of work on the expansion and a declaration the Forest Service violated the National Forest Management Act and the National Environmental Policy Act. The district court consolidated the hearing on the motion for preliminary injunction with a trial on the merits. Concluding the Appellants did not show a likelihood of success on the merits, or questions going to the merits so serious, substantial, difficult, and doubtful as to make the issues ripe for litigation, the district court denied the preliminary injunction motion, entered final judgment in favor of the Forest Service, and dismissed the case. Those rulings are now before us on appeal.[4]

## II. DISCUSSION

Appellants seek judicial review of the Forest Service's final decision pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706. We review

---

assessment, an environmental impact statement, a supplemental environmental impact statement, and two biological evaluations.

[4] This court denied Appellants' motion for injunction pending appeal by order dated October 14, 1998. Appellants' request for expedited decision, or, in the alternative, for stay pending the court's decision was likewise denied by order dated June 30, 1999.

that decision under 5 U.S.C. § 706(2)(A) to determine, de novo,[5] whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521 (10th Cir. 1992).

"[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' we must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine 'whether there has been a clear error of judgment.'" *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). We consider an agency decision arbitrary and capricious if

> "the agency ... relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Id*. (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Inc. Co.*, 463

---

[5] We afford no particular deference to the district court's review of an agency action; our review of the administrative record pertaining to the challenged action is independent. *Webb v. Hodel*, 878 F.2d 1252, 1254 (10th Cir. 1989); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1569 n.16 (10th Cir. 1994). We compliment the parties on their extraordinary efforts to compile, organize and accurately cite to the voluminous record.

U.S. 29, 43 (1983)).

Applying this standard, we examine Appellants' claims under the National Forest Management Act and the National Environmental Policy Act to ascertain whether the Forest Service examined the relevant data and articulated a rational connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

A. National Forest Management Act

1.      Overview

The National Forest Management Act directs the Forest Service to develop Land and Resource Management Plans ("Forest Plans") by which to manage each National Forest under principles of "multiple-use" and "sustained yield." 16 U.S.C. § 1604. Forest management occurs at two distinct levels. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 118 S. Ct. 1665, 1668-69 (1998).

At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document, accompanied by an environmental impact statement and public review process conducted in accordance with the National Environmental Policy Act. 42 U.S.C. § 4331 *et seq.*; *see also* 16 U.S.C. § 1604(d); 36 C.F.R.

§ 219.10(b).  The Forest Plan must incorporate multiple forest uses, and thus coordinate the management of "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness."[6]  16 U.S.C. § 1604(e)(1).  The Forest Plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives."  *Id*. at § 1604(g)(3)(B).

At the second level, the Forest Service implements the Forest Plan by approving (with or without modification) or disapproving particular projects such as the Category III expansion.  Proposed projects must be consistent with the Forest Plan, *id*. at § 1604(i), 36 C.F.R. § 219.10(e), and are subject to further National Environmental Policy Act review.  *See Ohio Forestry Ass'n*, 118 S. Ct. at 1668-69.

---

[6]  Relevant to the issues presented here, the White River National Forest Plan allocates approximately 3% of the 2.2 million acre forest for downhill skiing. The Forest Plan instructs the Forest Service to meet the desires of recreation visitors by developing additional skiing opportunities and amenities at existing resorts.  Pursuant to its authority under the National Forest Ski Area Permit Act, the Forest Service may issue permits for this purpose.  The permits "shall encompass such acreage as the Secretary determines sufficient and appropriate to accommodate the permittee's needs for ski operations and appropriate ancillary facilities."  16 U.S.C. § 497b(b)(3).

2.    Maintaining Viable Populations:  Population Data v. Habitat Analysis

To "provide for diversity of plant and animal communities" when planning or evaluating proposed projects on our national forests, the Forest Service must, among other things, manage:

> [f]ish and wildlife *habitat* ... to *maintain* viable *populations* of *existing* native and desired non-native vertebrate species in the planning area.  For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area.  In order to insure that viable populations will be maintained, *habitat* must be provided to support, at least, a minimum number of reproductive individuals and that *habitat* must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (emphasis added).

Appellants claim that in order to comply with the plain language of 36 C.F.R. § 219.19, the Forest Service must compile hard lynx population data (*e.g.*, the number of lynx, including reproductive lynx, found in the White River National Forest and Category III planning area, and lynx distribution in those areas), not just manage habitat for a hypothetical population.  The Forest Service and Vail contend it is permissible to substitute a habitat analysis for population data where, as here, (1) population data or estimates are unavailable, and (2) even if such data existed it would not improve the overall analysis because the project will not result in species loss.

-11-

To determine what type of data or analysis is necessary to satisfy 36 C.F.R. § 219.19, we, too, begin with the plain language, which unmistakably focuses on the provision and distribution of *habitat* in order to *maintain existing* viable *populations*. To the extent the regulation discusses, and therefore arguably requires, specific analysis of the estimated numbers and distribution of individual members of a species, it does so only in the narrow context of defining what constitutes a "viable population." A "viable population" exists when enough reproductive individuals of a given species are distributed throughout a given area to insure the continued existence of that species in that area. The regulatory language clearly presupposes the ascertainable presence of a species' population within a given planning area.

The administrative record before us indicates there is no existing lynx population in Category III or the White River National Forest from which to gather census or distribution data.[7] Indeed, the Colorado Division of Wildlife

_____

[7] For example: although probable lynx tracks were recorded in the area in 1991, last confirmed lynx sighting was on Vail Ski Area during the winter of 1973-74; last reported lynx capture within Colorado occurred twenty-five years ago on the Vail Ski Area; lack of a verifiable lynx population in Colorado is attributable to a variety of natural conditions and historic factors; only two sets of lynx tracks were positively identified after transecting 190.5 miles on and around the Vail ski area in thirteen days in 1989; a single set of possible tracks identified after transecting 2,053 miles primarily within the boundaries of the White River National Forest in 1992; after intensive efforts using snowtracking (5,833.5 mi),

believes "*if* any lynx remain in Colorado their numbers are so small that they do not represent a viable population, and are not detectable by known census methods." The United States Fish and Wildlife Service similarly "concludes that a self-sustaining resident [lynx] population does not exist in Colorado, but individual animals may be present." Because no ascertainable lynx population exists within Category III or the White River National Forest, we do not read 36 C.F.R. § 219.19 to require the Forest Service to collect or evaluate hard lynx population data prior to making its decision in this case.

A review of the plain language of 36 C.F.R. § 219.19 and its enabling statute, the National Forest Management Act, establishes Congress never intended to require the Forest Service to collect population data and make data-based population viability assessments as a precondition to managing habitat if, despite good faith efforts to confirm the presence of lynx,[8] no one has seen an actual lynx

---

hair snags (62 locations), remote cameras (110 locations) and snares (686 trap nights), only eleven sets of tracks that *appeared to have a high probability* of being lynx were found; the Colorado Division of Wildlife has offered a $500 reward for any positive information on lynx since 1993 and has not received any; there have been no road kills or accidental trapping or shooting of lynx since 1973.

[8] Appellants' claim there has been no meaningful effort to collect lynx population data is unfounded. The Colorado Division of Wildlife acknowledges twelve investigations since 1972 attempting to document the presence of lynx in Colorado. In its proposal to list the lynx as "threatened," the United States Fish

in the project area in over twenty-five years, and only a few sets of tracks have been documented in the past ten years. Under the circumstances, the best the Forest Service could do to comply with the Forest Plan mandate to develop additional skiing opportunities at existing resorts *and* provide for diversity of plant and animal communities within Category III, was to provide and distribute lynx habitat based on the best information available, on the remote chance a population of reproductive lynx might reoccupy the area in the future.

Our views on this issue are in complete accord with the Ninth Circuit's decision in *Inland Empire Pub. Lands Council v. United States Forest Serv.*, 88 F.3d 754 (9th Cir. 1996). In *Inland Empire*, the Forest Service approved timber sales based on a habitat analysis for seven sensitive species living in the Upper Sunday area of the Kootenai National Forest in Montana. The Ninth Circuit concluded the Forest Service's habitat analysis was not "in any way 'plainly erroneous'" or "'inconsistent'" with the plain language of 36 C.F.R. § 219.19, which "specifically provides that the Forest Service may discharge its duties

_____

and Wildlife Service acknowledged that "[s]ince the late 1970's, intensive surveying efforts have revealed only minimal evidence of lynx presence" in Colorado. Appellants cite no authority for the proposition the Forest Service itself must conduct or commission a study, concurrent with its environmental assessment of a proposed project, to satisfy its planning or species diversity mandates.

-14-

through habitat management as long as 'habitat [is] provided to support, at least, a minimum number of reproductive individuals and that habitat [is] well distributed so that those individuals can interact with others in the planning area.'" *Id*. at 761 (quoting 36 C.F.R. § 219.19). The court further upheld the Forest Service's more limited analysis of the flammulated owl's nesting and feeding habitat requirements, because "such data were unavailable" and "an analysis that uses all the scientific data currently available is a sound one." *Id*. at 762. In so holding, the court appropriately noted the deference due an agency's interpretation of its own regulations, especially when that interpretation involves questions of scientific methodology. *Id*. at 760; *see also Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1153-54 (9th Cir. 1998).

To the extent other courts have read 36 C.F.R. § 219.19 to prohibit reliance on habitat analysis without hard population data, *see, e.g., Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999); *Sierra Club v. Glickman*, 974 F.Supp. 905 (E.D. Tex. 1997); *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291 (W.D.Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996), those decisions are distinguishable from this case in at least two important ways: (1) they involved the application of § 219.19 under circumstances in which population data was available; and (2) they involved the provisions of § 219.19

applicable to the use of a Management Indicator Species as a proxy for determining the effects of management activities on other species. *See Martin*, 168 F.3d at 4-8; *Glickman*, 974 F.Supp. at 936-38; *Seattle Audubon Soc'y*, 871 F.Supp. at 1315-16. As discussed above, there simply is no lynx population data available to the Forest Service in this case. Moreover, when considering the Category III expansion, the Forest Service logically did not select the rare and elusive lynx as a Management Indicator Species. Thus, the population inventory requirements of § 219.19 that apply to Management Indicator Species are irrelevant to the issue before us.

It would be inappropriate to comment here on the soundness of those opinions requiring population inventories and data-based viability assessments under very different facts and forest planning contexts. We simply hold the regulatory language does not require the Forest Service, under the circumstances of this case, to collect actual lynx population data. It would be absurd to permit project opponents to utilize the population viability regulation to block consideration and approval of projects otherwise consistent with the applicable Forest Plan when no evidence shows a population of a given species is present within the relevant planning area, and when the viability of any individual members of that species can otherwise be protected by appropriate habitat

preservation and distribution.  Thus, in this case, where no viable population exists, we recognize habitat identification and preservation as a legitimate means of ensuring any future lynx viability.[9]

Appellants further argue that even if we read 36 C.F.R. § 219.19 to permit the use of a habitat analysis instead of a data-based viability assessment, the Forest Service nevertheless made assumptions without the necessary background information and failed to make important viability findings.  These claims lack logic and support in the record.

In large part, Appellants' back-up argument amounts to a repackaging of their primary argument.  As we fail to see how the Forest Service could be required to gather population data where no population exists, we similarly fail to see how the Forest Service could be required to determine precisely how much habitat is necessary to maintain a nonexistent lynx population, or to conclude it is maintaining a viable population where none exists.[10]  Here again, we conclude it

_____

[9] Like the Ninth Circuit in *Inland Empire*, however, we encourage the Forest Service to analyze the viability of any species' population in terms of actual population size, trends, dynamics, and distribution when such data is available.  *See Inland Empire*, 88 F.3d at 761 n.8.

[10] We are particularly puzzled by Appellants' argument that the Forest Service somehow acted arbitrarily and capriciously by providing and distributing

was entirely reasonable under the circumstances for the Forest Service to rely on the best available scientific information[11] to (1) identify the parameters of suitable habitat, (2) estimate the amount of suitable habitat available in and adjacent to the project area, and (3) determine the anticipated effects of the proposed action on each type of habitat in order to provide and distribute sufficient habitat to mitigate the loss of any individual lynx possibly present in the planning area.

Having studied the administrative record, and giving a practical

_____

lynx habitat, even in the absence of population data, in order to protect the species' future viability. They reason, "[p]roviding habitat where few or no animals exist will not protect lynx, particularly given that the lynx may already have dropped below the level of viability." Apparently, Appellants seek the protection of habitat or species based on hard population data, or no protection at all; unless, as counsel suggested at oral argument, Appellants take the position that if no lynx population exists in the planning area, to comply with 36 C.F.R. § 219.19 the Forest Service may be required to introduce a lynx population and then maintain habitat for that population. Because Appellants did not raise or support that argument in their brief on appeal, we do not address it here, except to state we see no support for that proposition in the statutory or regulatory language cited.

[11] The Forest Service examined available data on the characteristics of lynx denning, foraging, and traveling habitats, and, based on that data, established conservative parameters for each so as to define suitable habitat and determine the amount of each type habitat contained in the project area, the landscape area, the regional area, and the eastern portion of the White River National Forest. The Forest Service concluded that because fundamental habitat needs for lynx are similar throughout their North American range, it could reasonably assume that data from the Northern Rocky Mountains are applicable to lynx habitat needs in Colorado. We agree.

interpretation to the Forest Service's regulatory mandate, consistent with the "overall multiple use objectives" and "inherent flexibility" of the National Forest Management Act, *Moseley*, 80 F.3d at 1404, we hold the Forest Service's lynx habitat analysis and lynx viability assessment did not violate the National Forest Management Act or 36 C.F.R. § 219.19, and was not arbitrary and capricious.

B.  National Environmental Policy Act

Federal agencies must comply with certain procedures prior to taking any action or making any decision that could significantly affect the quality of the human environment.  More precisely, the National Environmental Policy Act directs all federal agencies to:

> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on –
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be

implemented.

42 U.S.C. § 4332(2)(C) (listing the requirements for an environmental impact statement); *see also* 40 C.F.R. § 1500 *et seq.* (Council on Environmental Quality regulations expanding upon the appropriate form and content of an environmental impact statement).

Congress intended these "action-forcing procedures" merely to guarantee that agencies take a "hard look" at the environmental consequences of proposed actions utilizing public comment and the best available scientific information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Holy Cross*, 960 F.2d at 1521; *see also* 40 C.F.R. § 1500.1. Consequently, the National Environmental Policy Act "prescribes the necessary process," but "does not mandate particular results." *Holy Cross*, 960 F.2d at 1522 (quotation marks and citation omitted); *see also Methow Valley*, 490 U.S. at 350. Stated differently, the Act "prohibits uninformed – rather than unwise – agency action." *Methow Valley*, 490 U.S. at 351.

Appellants claim the Forest Service failed to take the "hard look" Congress intended when it analyzed the environmental impact of Vail's proposed Category III expansion. Specifically, Appellants contend the Forest Service failed to: (1)

obtain necessary information concerning the lynx or disclose that such information was unavailable; (2) properly analyze mitigation measures; (3) analyze a range of reasonable alternatives; (4) properly analyze indirect and cumulative impacts caused by an increase of up to 218,000 skier visits per year; and (5) analyze significant new information concerning significant undisclosed impacts of the project. We consider these claims in turn.

       1.    Adequacy of the Final Environmental Impact Statement.

The first four National Environmental Policy Act issues Appellants raise pertain to the adequacy of the Final Environmental Impact Statement. In reviewing the adequacy of a final environmental impact statement we merely examine "whether there is a reasonable, good faith, objective presentation of the topics [the National Environmental Policy Act] requires an [environmental impact statement] to cover." *Holy Cross*, 960 F.2d at 1522 (quotation marks and citation omitted). Our objective is not to "fly speck" the environmental impact statement, but rather, to make a "pragmatic judgment whether the [environmental impact statement]'s form, content and preparation foster both informed decision-making and informed public participation." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) (quotation marks and citation omitted).

a.     Lynx Information

Council on Environmental Quality regulations require agencies to include complete information in an environmental impact statement "[i]f the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant."  40 C.F.R. § 1502.22(a).  Appellants' claim that the Forest Service violated the National Environmental Policy Act and this regulation by failing to obtain and analyze all information concerning the lynx, amounts to a second attempt to have this court read regulatory language to impose data gathering requirements under circumstances where no such data exists.

As noted above, the Forest Service collected and utilized the best available data to (1) analyze the possible impact of the proposed Category III expansion and reasonable expansion alternatives on lynx habitat, and (2) identify and preserve sufficient lynx habitat to mitigate any impact on individual lynx that may live in or travel through the Category III area.  We reiterate our belief the Forest Service was not arbitrary and capricious in its analysis, and conclude the analysis constitutes a reasonable, good faith presentation of the best information available under the circumstances.  Appellants simply fail to show how additional, site-specific lynx data is "essential" to reasoned decision making; thus, we hold the

Forest Service did not violate 40 C.F.R. § 1502.22(a) or the National Environmental Policy Act.

Moreover, we are unwilling to give a hyper-technical reading of the regulations to require the Forest Service to include a separate, formal disclosure statement in the environmental impact statement to the effect that lynx population data is incomplete or unavailable. *See* 40 C.F.R. § 1502.22(b). Congress did not enact the National Environmental Policy Act to generate paperwork or impose rigid documentary specifications. *See* 40 C.F.R. § 1500.1(c). The record in this case amply demonstrates the participants in the environmental review process were well aware of the relevance of lynx population data to consideration of the Category III expansion, the scarcity of such data, and the studies and reports the Forest Service used to evaluate lynx impacts based on available distribution, denning, and foraging habitat information. As such, an additional, formal statement citing and specifically parroting the regulatory language at 40 C.F.R. § 1502.22(b) would serve no useful purpose, and the omission of such a statement in this case does not violate the National Environmental Policy Act. *See* 40 C.F.R. § 1500.3 (trivial violations not actionable).

b.     Mitigation Analysis

By statute and regulation, an environmental impact statement must include a discussion of possible mitigation measures to avoid adverse environmental impacts.  *See* 42 U.S.C. § 4332(C)(ii); 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1508.14, 1508.25(b)(3); *see also Methow Valley*, 490 U.S. at 351-52.  Such discussion must be "reasonably complete" in order to "properly evaluate the severity of the adverse effects" of a proposed project prior to making a final decision.  *Methow Valley*, 390 U.S. at 352; *see also Holy Cross*, 960 F.2d at 1523.  It is not enough to merely list possible mitigation measures.  *See Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998).

Appellants contend the Forest Service's mitigation discussion pertaining to the Category III expansion is insufficient because, although the agency listed and numerically rated the effectiveness of a number of mitigation measures, it "failed to evaluate the measures' effectiveness in any way."  Appellants further claim the Forest Service included mitigation measures in its 1996 and 1997 Records of Decision that it never analyzed or proposed in the underlying environmental review documents.  The administrative record belies both claims.

It can hardly be said the Forest Service did little more than list numerous mitigation measures. To the contrary, the Forest Service identified nearly 150 project-specific mitigation measures, and, as evidenced by the numerical effectiveness ratings,[12] separately analyzed and evaluated each. The Forest Service provided a narrative discussion of the possible mitigation measures applicable to each resource affected by the proposed expansion. The intent and efficacy of certain mitigation measures is further derived from the impact analysis pertaining to issues of particular public interest, such as trees, wetlands, erosion control, and lynx and other wildlife. Finally, the Forest Service properly identified which mitigation measures it adopted in its Records of Decision,[13] 40 C.F.R. § 1505.2(c), and where relevant, noted the cooperating agencies' recommendations and/or findings regarding those adopted measures.

---

[12] Appellants cite no evidence and do not appear to argue that the Forest Service arbitrarily assigned a numerical value to each mitigation measure. That Appellants cite to an "expert" who opined the Forest Service failed to discuss the mitigation measures in adequate detail, is of little consequence given our deferential standard of review and the established principal that agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).

[13] Having reviewed the record, we simply cannot agree with Appellants' assertion that the decision documents themselves adopted mitigation measures substantially different from those proposed and analyzed in the environmental impact statements.

This record demonstrates the Forest Service included a reasonably complete discussion of possible mitigation measures in the appropriate environmental review documents. The mitigation analysis certainly was adequate to foster informed public participation as well as an informed decision, and thus satisfied the National Environmental Policy Act mandate.

          c.     Alternatives Analysis

The alternatives analysis is characterized as "the heart" of the environmental impact statement. 40 C.F.R. § 1502.14. To comply with the National Environmental Policy Act and its implementing regulations, the Forest Service is required to rigorously explore all reasonable alternatives to the Category III expansion in comparative form, and give each alternative substantial treatment in the environmental impact statement. *Id.* at §§ 1502.1, 1502.14(a); 42 U.S.C. §§ 4332(2)(C)(iii) & (E); *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992).

When evaluating the adequacy of the Forest Service's alternatives analysis (*i.e.*, the number of alternatives the Forest Service was required to consider and the requisite level of detail), we employ the "rule of reason" to ensure the environmental impact statement contained sufficient discussion of the relevant

issues and opposing viewpoints to enable the Forest Service to take a hard look at the environmental impacts of the proposed expansion and its alternatives, and to make a reasoned decision. *Pueblo Council*, 975 F.2d at 1445. We note the National Environmental Policy Act "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective." *Id*. at 1444 (quotation marks and citation omitted). "What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Id*. (quotation marks and citation omitted).

Appellants assert the Forest Service violated the National Environmental Policy Act by "arbitrarily and capriciously refus[ing] to consider in detail a reasonable development alternative proposed by Appellant Colorado Environmental Coalition." Appellants further argue the district court erred by allowing Vail's stated purpose and need for the expansion to "categorically preclude" consideration of Colorado Environmental Coalition's "Conservation Biology Alternative."[14] They encourage us to adopt the standard applied by the

---

[14] According to Appellants, the Colorado Environmental Coalition's Conservation Biology Alternative would provide (1) up to 232 additional acres of skiable terrain; (2) increased reliable, early season skiing without additional snowmaking; (3) a lift to improve access and alleviate skier crowding at certain areas and provide a back-up evacuation route; (4) improved and increased front-

Seventh Circuit, such that "the evaluation of 'alternatives' mandated by [the National Environmental Policy Act] is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986); *see also Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997).

As noted, the National Environmental Policy Act and Council on Environmental Quality Regulations require the Forest Service to study in detail all "reasonable" alternatives. 42 U.S.C. §§ 4332(2)(C)(iii) and (E), 40 C.F.R. §§ 1502.1, 1502.14(a). The Seventh Circuit, and other courts, have interpreted this requirement to preclude agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative (*i.e.*, the applicant's proposed project). *See, e.g., Simmons*, 120 F.3d at 669; *c.f. Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195-96 (D.C. Cir.), *cert. denied*, 502 U.S. 994 (1991). Agencies also are precluded from completely ignoring a private applicant's objectives. *See Busey*, 938 F.2d at 196; *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985); *Guidance*

side intermediate terrain; and (5) transportation to nearby resorts to improve the overall distribution of skiers during peak periods.

*Regarding NEPA Regulations*, 48 Fed. Reg. 34263, 34267 (July 28, 1983). We do not perceive these authorities as mutually exclusive or conflicting. They simply instruct agencies to take responsibility for defining the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes. Beyond this, there are no hard and fast rules to guide the alternatives analysis. Our task, then, is to determine whether the Forest Service stepped outside the established parameters by declining to give more attention to the Conservation Biology Alternative the Appellants prefer, or, stated differently, whether the alternatives analysis provided satisfies the rule of reason.

The record reveals the Forest Service considered the Regional Guide, the White River Forest Plan, prior Forest Service planning and permitting decisions in accordance with the National Forest Ski Area Permit Act of 1986, and Vail's expressed needs and goals, when drafting the statement of purpose and need for the Category III expansion environmental impact statement. Indeed, the Forest Service expressly referenced the agency management goals to be achieved vis-à-vis implementation of the Category III proposal. The record thus disproves Appellants' claim the Forest Service blindly adopted Vail's articulated purpose and need.

While we appreciate that Appellants zealously advocate a wilderness conservation philosophy and would like to see that philosophy expressly recognized in environmental impact statements and other environmental review documents, and implemented by the Forest Service and other federal land/resource management agencies, the fact is the Forest Service could not consider the proposed Category III expansion in a vacuum. The White River Forest Plan, itself subject to National Environmental Policy Act review, previously prescribed additional winter recreation development on the Forest, and designated the Category III area for that purpose. We hold the Forest Service was fully authorized within this decision-making context to limit its consideration to expansion alternatives designed to substantially meet the recreation development objectives of the Forest Plan. Accordingly, the statements of purpose and need drafted to guide the environmental review process concerning the proposed Category III expansion are not unreasonably narrow.[15] *See City of Angoon v.*

---

[15] The Forest Service defined the needs of the proposal as:

1.      To respond to a proposal which has the potential for offering more effective recreation utilization of public lands without creating additional demands and impacts on off-site lands and communities.

2.      To help to achieve Forest Service goals by providing high quality recreation experiences for visitors to the National Forest, specifically within the Vail Ski Area [special use permit] area.

*Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986), *cert. denied*, 484 U.S. 870 (1987)

(court not at liberty to restate the purpose in terms of a broad social interest).

It is within this defined context that the Forest Service analyzed four alternatives in detail, including the required "no action" alternative. The three development alternatives varied primarily in the amount and type of additional skiable terrain and related amenities to be developed, and, consequently, in the type and degree of environmental impacts each would impose. The Forest Service made clear it formulated alternatives "to respond to the significant issues identified during scoping while still addressing the purpose and need for the Proposed Action and maintaining consistency with pertinent Forest Service

---

3.      To fulfill the broad management goals of the [White River National Forest] Land and Resource Management Plan.

The identified objectives (purposes) correspond to those needs:

1.      Enhance the quality of skiing opportunities within [Vail's] existing [special use permit] area by [specified] means....

2.      Make more efficient use of existing local and on-mountain infrastructure at Vail Ski Area during traditionally low periods of use.

3.      Support community and ski area efforts to stabilize seasonal economic fluctuations and build annual skier visitation at Vail Ski Area without increasing peak-days.

policy."

In declining to analyze more thoroughly the Conservation Biology Alternative, the Forest Service noted it would not add "appreciably more" or "substantially increase" intermediate ski terrain. In fact, "[t]he most optimistic estimate of skiable terrain that could be made available under this alternative (232 acres) represents about half of the terrain that would result from the most limited of the development alternatives."[16] The Forest Service reasoned, "[w]hen the purpose is to add terrain in order to respond to specific qualitative needs at the ski area, it is appropriate to dismiss from consideration ski trail development opportunities that would not advance those objectives." In light of the defined purpose and need for the expansion, which we have upheld as reasonable, we conclude the Forest Service provided a reasonable explanation for declining to further consider the Conservation Biology Alternative in accordance with 40 C.F.R. § 1502.14(a). Moreover, the Forest Service provided sufficient discussion

---

[16] The Forest Service further explained that much of the terrain proposed under the Conservation Biology Alternative was either previously approved, and hence available under the no-action alternative (130 acres), or would not provide needed intermediate skiing due to topography, elevation or location (74 acres). Moreover, the new access lift and skier busing components of the Conservation Biology Alternative were already in place or contemplated under the other alternatives.

of the relevant issues and opposing viewpoints to demonstrate it took the requisite "hard look" at an adequate array of alternatives to make a reasoned decision.

### d. Impact Analysis

An environmental impact statement must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of "past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; *see also* §§ 1508.8 (including ecological, aesthetic, historical, cultural, economic, social and health impacts) and 1508.25(a)(2), (c).

Appellants contend the Forest Service failed to adequately consider off-site, indirect cumulative impacts. More specifically, they claim (1) the Forest Service gave short shrift to its analysis of the socioeconomic impact of increased skier visitation and spending in Vail and Eagle County, and (2) the agency's conclusions concerning socioeconomic impacts are arbitrary and capricious because they are based on unreasonable assumptions and are not supported by the record. According to Appellants, "[i]ncreased visitorship and spending attributable to the expansion will undoubtedly further spur real estate speculation, ... worsen parking and housing woes, increase activity in the retail industry, and

harm virtually every aspect of the human environment." In support of their argument, Appellants cite to the comments of Mr. Charles Romaniello, a natural resource economist, to the effect the Forest Service is capable of, but failed to project or discuss the secondary and tertiary revenue flows produced by increased skier numbers.

Here again, the fact that Appellants cite an expert who agrees with their position and alleges a lack of analysis is not dispositive. It merely reflects the crux of their complaint – they disagree with the Forest Service's decision. Our job is not to question the wisdom of the Forest Service's ultimate decision or its conclusion concerning the magnitude of indirect cumulative impacts. *Cf. Holy Cross*, 960 F.2d at 1522. Rather, we must examine the administrative record, as a whole, to determine whether the Forest Service made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making. *Id*. Having carefully reviewed the record, we conclude the Forest Service's impact analysis is adequate.

First, we take issue with Appellants' characterization of the Forest Service's conclusions concerning socioeconomic impacts. We found no evidence in the record, nor did Appellants provide a citation to the record, to support their

claim the Forest Service assumed or concluded there would be "no impact at all on numerous aspects of Vail's and Eagle County's socioeconomy." To the contrary, the record demonstrates that after identifying and analyzing various off-mountain, growth-related socioeconomic factors potentially impacted by the Category III expansion, the Forest Service concluded that those impacts would be relatively minor under any of the alternatives, including the no action alternative.

The Forest Service's analysis includes discussions of the assumptions applied,[17] the facts and rationale supporting those assumptions, the appropriate scope of analysis given those assumptions, and the foreseeable direct, indirect and cumulative impacts on socioeconomic resources in Vail and Eagle County. Read in context, as a whole, the documentation patently refutes Appellants' arguments the assumptions "contradict logic and reason" and the analysis is arbitrary and capricious. Accordingly, Appellants' challenge to the adequacy of the off-site

---

[17] The Forest Service assumed Vail's skiers-at-one-time capacity of 19,900 will remain constant as reflected and approved in Vail's existing special use permit. The Forest Service further assumed many "pertinent aspects" of the community's infrastructure (*e.g.*, skier service and retail employment base, and lodging and restaurant capacity) "have been developed to accommodate high-use periods and are underutilized during off-peak periods." Both assumptions are based on documented facts. The 19,900 skiers-at-one-time capacity was formally evaluated in the 1986 environmental assessment analyzing the impacts of Vail's master development plan.

indirect and cumulative impact analysis fails.

 2. New Information Requiring a Supplemental Environmental Impact
 Statement.

Appellants' final National Environmental Policy Act issue pertains to the Forest Service's obligation to prepare a supplemental environmental impact statement to analyze the cumulative environmental impact of potential development on land adjacent to the Category III expansion area known as the "Gilman Tract." Appellants contend they provided the Forest Service with "clear information" it is now reasonably foreseeable Vail "or some other purchaser will use the [Gilman tract] for development of private homes, commercial activities, and recreation, with consequently dramatic cumulative impacts on wildlife, water, forests, and other resources in and around the [Category III] area." Appellants further claim Vail has a financial interest in, and has discussed specific development plans for, the Gilman Tract. According to Appellants, the Forest Service "bluntly and blithely ignore[d] the new information."

Agencies are required to prepare supplemental environmental impact statements, before or after issuing a record of decision, if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); *Marsh*, 490

U.S. at 372. This requirement is not interpreted to require a supplemental environmental impact statement "every time new information comes to light." *Marsh*, 490 U.S. at 373. A supplemental environmental impact statement comes into play only "if the new information is sufficient to show [the proposed action] will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Id*. at 374 (quotation marks and citation omitted). Because the relative significance of new information is a factual issue, we review the Forest Service's decision regarding the need for a supplemental environmental impact statement under the "arbitrary and capricious" standard. *Holy Cross,* 960 F.2d at 1524 (citing *Marsh*, 490 U.S. at 374, 377). Consequently, we must uphold the Forest Service's decision to forego a supplemental environmental impact statement so long as the record demonstrates the Forest Service reviewed the proffered supplemental information, evaluated the significance – or lack of significance – of the new information, and provided an explanation for its decision not to supplement the existing analysis. *Holy Cross*, 960 F.2d at 1527. Applying this standard, we reject Appellants' claim.

The record shows the Forest Service received Appellants' April 1998 letter notifying it of "new" information concerning the Gilman Tract. The record further shows the Forest Service reviewed and considered the import of such

information, but determined it previously disclosed and addressed the relevant substantive content of the proffered information in the existing environmental review documents. Additional documents further evidence Forest Service and general public awareness of Vail's interest in potential development of the Gilman tract long before Appellant's April 1998 letter. In sum, the record amply proves the Forest Service did not arbitrarily and capriciously determine the proffered information was neither new nor significant. We therefore uphold the agency's decision to forego preparation of a supplemental environmental impact statement.

## III. CONCLUSION

For the foregoing reasons, we hold the Forest Service complied with the National Forest Management Act and 36 C.F.R. § 219.19, and provided the "hard look" at the Category III expansion mandated by the National Environmental Policy Act. Accordingly, we **AFFIRM** the district court's judgment and orders.