KICKAPOO VALLEY STEWARDSHIP
ASSOCIATION, Plaintiff–
Appellant,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,
Defendants–Appellees.

No. 01–3576.

United States Court of Appeals,
Seventh Circuit.

Argued May 13, 2002.

Decided June 20, 2002.

Before ROVNER, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

## ORDER

This appeal challenges the ongoing rehabilitation and reconstruction of 5.9 miles of State Trunk Highway 131 between Rockton and Ontario, Wisconsin. Plaintiff Kickapoo Valley Stewardship Association (KVSA), a coalition of concerned area residents, was denied preliminary and permanent injunctive relief that would have halted construction of the road pending reconsideration of various alternative construction plans and supplementation of the project's Environmental Impact Statement (EIS). According to the KVSA, the government agencies responsible for the project, the U.S. Department of Transportation's Federal Highway Administration (FHA) and the Wisconsin Department of Transportation (together, the DOT), failed to adequately consider alternative highway construction plans during the EIS drafting process. The KVSA also argues that the current construction plans violate various federal regulations, orders, and guidelines protecting environmentally sensitive areas. For the reasons given below, we conclude that the DOT adequately considered alternative plans in accordance with prescribed processes, that the current plans do not substantively violate the governing environmental regulations raised by the KVSA, and affirm the district court's denial of permanent injunctive relief.

### I. Facts

The stretch of STH 131 that passes between Rockton and Ontario is located within the Kickapoo Valley Reserve, which is over 8,000 acres of land along the Kickapoo River in southwestern Wisconsin initially purchased by the Army Corps of Engineers for a flood-control project. Adjacent to the Reserve and also affected by the STH 131 project is a portion of Wildcat Mountain State Park. Planning for a dam began in the 1960s, and planning for the relocation of STH 131 and a neighboring road, STH 33, began in the 1970s. Notice of intent to prepare an EIS was published in 1986, and the Draft EIS was circulated in 1992, with public hearings held later that year. The Water Resources Development Act of 1996 (WRDA), Pub.L. No. 104–303, 110 Stat. 3658 (1996), terminated the dam project, provided for the transfer of the Kickapoo Reserve from the Corps of Engineers to the State of Wisconsin, mandated that STH 131 be rebuilt, and cancelled the relocation of STH 33. An Environmental Re–Evaluation was conducted by the Wisconsin DOT and the FHA in November 1998, and the Final EIS was approved in September 1999.

In August 2001, the KVSA filed a motion for a temporary and/or permanent injunction to halt construction and start anew the EIS process. That motion was denied by the district court that October. Construction has already begun; at the time of oral argument before this Court, new bridges over the Kickapoo River were in place and the leveling and grading of the new road surface was underway.[1]

### II. Analysis

#### A. Compliance with NEPA

The KVSA first claims that the DOT inadequately considered alternative routes

---

1. In its appellate brief, the KVSA also asked as a form of relief that replacement of four of the six original bridges subject to replacement be halted. At oral argument, the KVSA conceded that it was not possible for the old bridges to be put back in place, and that the new bridges should not be removed. It still claims, however, that the construction on the new roadbed should be halted and a Supplemental EIS be drafted.

for STH 131 during the planning process in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq. By giving these alternatives short shrift, the KVSA argues, the government was able to ramrod its desired plan through the environmental review process without subjecting it to the evaluation process required by the NEPA. We review agency compliance with the NEPA under the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706, and find agency action improper only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *See Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 953 (7th Cir.2000). Our review is limited to evaluating the DOT's decision-making process; we may not substitute our judgment for the agency's substantive consideration of environmental issues. *See FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 802, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Heartwood*, 230 F.3d at 953.

1. Integration of the Final EIS and Draft EIS

The KVSA argues that there were alternative routes which would have imposed less of an environmental burden on the Kickapoo Valley if chosen, and that these routes were inadequately considered. They point to fourteen routes identified in the Draft EIS, but not carried forward into the Final EIS. The four alternatives brought forward for further study in the Final EIS included a no-action alternative (a NEPA-mandated option), the "preferred alternative," which generally followed the basic contours of the earlier STH 131 along the Kickapoo River, and two routes that bypassed the Kickapoo Reserve. Since the latter two alternatives conflicted with the WRDA's provisions permitting STH 131's reconstruction, the "preferred alternative," which generally followed the

already-existing STH 131 route with adjustments to allow for a higher design speed, was the only viable route considered in the Final EIS. The KVSA also alleges that a Supplemental EIS should have been conducted during the seven years between the Draft EIS and the Final EIS in light of the time between the two documents, especially given the intervening passage of the WRDA.

■ These arguments ignore the explicit integration of Final EIS and Draft EIS. As the abstract to the Final EIS notes, the "Final EIS is prepared to avoid repetition of material in the Draft EIS by incorporating it by reference." This is in keeping with the Council for Environmental Equality's (CEQ) rules for Draft EIS's, which instruct agencies to conform a Draft EIS as closely as possible to the Final EIS form. *See* 40 C.F.R. § 1502.9. CEQ rules also require agencies to avoid creating duplicative records by incorporating material by reference whenever possible, so long as the incorporation does not impede public review of the EIS. *See* 40 C.F.R. § 509.21. The KVSA's contention that the government ignored alternatives that it should have evaluated based on their exclusion from the Final EIS and despite their inclusion in the Draft EIS, therefore, is a fundamental misreading of the Final EIS, and if alternative plans were found to be unworthy of further study at the Draft EIS stage, CEQ regulations discourage, if not prohibit, government agencies from reiterating these conclusions in the Final EIS.

2. Need to Conduct a Supplemental EIS

The CEQ requires agencies to supplement an EIS if "the agency makes substantial changes to the proposed action that are related to environmental concerns; or there are significant new cir-

cumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). The FHA's own regulations require a written re-evaluation of a Draft EIS if a Final EIS is not completed within three years of the Draft EIS's circulation, see 23 C.F.R. § 771.129(a), and the drafting of a Supplemental EIS if "new information or circumstances relevant to environmental concerns and bearings on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. § 771.130(a)(2). As the DOT's Re-Evaluation describes, the significant change that occurred between the circulation of the Draft EIS in 1992 and the Re-Evaluation in 1998 was the passage of the WRDA, whose requirements on the STH 131 project are described in further detail below. The KVSA argues that this Re-Evaluation was insufficient, and that a Supplemental EIS should be created instead.

■ The WRDA's provisions did not impose any additional constraints on the STH 131 construction project that would necessitate further investigation, but rather eliminated the concurrent reconstruction of STH 33, forcing the DOT to examine in more detail a subset of the options already considered in the Draft EIS, including the route designated as the "preferred alternative" by the DOT. These new requirements did not add new information or change the outcome of the STH 131 project, because the Draft EIS's preferred alternative already followed the route mandated by the WRDA. Since no substantial changes were made to the proposed alternative as a result of the WRDA, and no new facts or changes to the environment, as noted in the 1998 Environmental Re-Evaluation, the DOT was within its discretion to not draft a Supple-

mentary EIS. See, e.g., Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1177–78 (10th Cir.1999).

### 3. Adequate Consideration of Alternative Routes

We evaluate the KVSA's claim of inadequate consideration of alternative routes for STH 131 by looking at the Draft EIS, since that when the alternatives the KVSA points to were considered unworkable. We do not look to see whether the alternative chosen by the DOT was the most environmentally-friendly of the lot, or that it represented the least expensive means of achieving environmental goals. Our review is to determine only whether the DOT took a "hard look" at other available options, see Eagle Found. v. Dole, 813 F.2d 798, 803 (7th Cir.1987), with the KVSA having the burden of proof to demonstrate that the DOT failed to do so. See Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir.1995). The KVSA does not argue that there were an unacceptably small number or range of alternatives considered, see, e.g., Simmons v. United States Army Corps of Eng'rs, 120 F.3d 664, 670 (7th Cir.1997), and their appeal to safety as a reason to carry forward other alternatives is insufficient. The DOT must consider the alternative plans in reference to the general goals of the project. See Van Abbema v. Fornell, 807 F.2d, 633, 638 (7th Cir.1986). As described in the Draft EIS, one of the general goals of the STH 131 project is to improve user safety, especially given the many kinds of vehicles that use STH 131. The KVSA argues that lower design speeds are generally safer, and that ignoring this maxim was arbitrary and capricious. As the Draft EIS shows, however, portions of STH 131 had very low posted and recommended speeds (as low as 25 miles per hour), yet the accident rate was much higher than comparable roads. Also, the KVSA's ar-

gument that the DOT failed to consider alternatives with a narrower right of way ignores the concerns of cyclists, horseback riders and other users of the road whose safety would be greatly enhanced by the addition of a shoulder alongside the main motor vehicle surface.

■ The KVSA's general claims of improper decision making are not enough for it to prevail; it does not claim that the reasons given for a particular alternative's elimination at the Draft EIS stage were improper, nor does it claim that the decision-making process generally was one that would warrant negating the DOT's findings, given our deferential standard of review. This is not a case like *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), where, in the 4(f) context, the decision-making process was rightly criticized due to the lack of written findings on the record. It is also not like *Eagle Foundation,* where proposed alternative routes were not considered by the agency. Rather, the DOT considered several alternative routes for STH 131 "viable," but nevertheless eliminated them after considering various factors affecting the project. That the alternatives not chosen for further evaluation in the Final EIS had only a brief description of why they were not selected does not show that the alternative was given short shrift; 40 C.F.R. § 1502.14 requires only that the agency "briefly discuss" why the alternative was eliminated from consideration. The more important explanation, which the DOT sets out in the relevant sections of the Draft EIS, is why certain characteristics of a plan, such as design speed, would render alternative plans undesirable. Without specifically describing *why* the evaluation process was arbitrary and capricious, the KVSA's NEPA claims fail.

The KVSA's claim that the EIS failed to address how various alternative routes complied with applicable governing environmental statutes, rules, and orders is unpersuasive for the same reasons of vagueness as described above. While the KVSA argues that the final plan currently under construction violates these environmental protection measures (unsuccessfully, as we describe below), it does not argue that the alternatives selected for further study so clearly violated these measures that their selection was arbitrary or capricious. Nor does the KVSA argue that the DOT's evaluation of the different environmental constraints imposed on the STH 131 project by the relevant statutes, rules, and orders was conducted in an improper manner. Again, without alleging *how* the DOT's consideration of alternative plans arbitrarily and capriciously failed to address the relevant environmental constraints, the KVSA fails to meet its burden of proof and we affirm the district court's denial of injunctive relief.

**B. Compliance with Executive Order 11990, the Water Resources Development Act of 1996, and Section 4(f) of the Transportation Act**

The KVSA's substantive challenge to the government's plan alleges that the plan violates several restrictions designed to protect environmentally sensitive areas. Specifically, they claim that the land transferred to the State of Wisconsin in the WRDA that STH 131 uses is protected under Section 4(f) of the Transportation Act, which includes public lands designated as a "public park, recreation area, or wildlife and waterfowl refuge." 49 U.S.C. § 303. Also, the KVSA believes that the project violates Executive Order 11990, which protects wetlands.[2] The final plan

2. The KVSA also alludes to an argument that

the plan also violates Executive Order 11988,

described by the government in the various environmental impact statements, contrary to the KVSA's assertions, complies with these various laws and regulations and adequately considered the alternatives when such evaluations are required. We review the district court's rulings for an abuse of discretion, *see 3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir.2001).

### 1. Water Resources Development Act of 1996

Section 361(b)(4)(C)(ii) of the WRDA specifies that as part of the Kickapoo Reserve's transfer to the State of Wisconsin, it "shall be preserved in a natural state and developed only to the extent necessary to enhance outdoor recreational and educational opportunities." This restriction, the KVSA argues, constrains the reconstruction of STH 131 to only the extent necessary for the enhancement of outdoor recreational and educational opportunities.

■ This interpretation of the WRDA is a misreading of the statute. One provision compels the Secretary of the Army to complete the reconstruction of STH 131. Another is for the Secretary of the Army to transfer the Kickapoo Reserve to the State of Wisconsin and the Ho–Chunk Nation, through the Department of the Interior. The use restriction that the KVSA points to is a restriction that limits what *Wisconsin* can do with the transferred lands, not what the Secretary of the Army can do. Therefore, the STH 131 project is to follow the old right-of-way and technical memorandum as quoted above, but is not constrained by the WRDA's usage restrictions.

In addition, the KVSA argues that DOT oversteps the WRDA's provision allowing the reconstruction of STH 131 to go for-

ward. According to the WRDA, reconstruction is to be "substantially in accordance with the plans contained in Design Memorandum No. 6, Relocation–LaFarge Reservoir, dated June 1970, except that the relocation shall generally follow the existing road rights-of-way." The KVSA argues that the Design Memorandum mandates routing STH 131 above the 50–year flood level, and that the plan approved by the DOT routes the new STH 131 above the 100–year flood level, thus violating the WRDA's directive. According to Design Memorandum No. 6, STH 131 would have to be routed at elevations of 858 feet or higher to clear the 50–year frequency level of the then-planned reservoir that was to flood the Kickapoo Valley. The current plan, as described in the Draft EIS, is designed to be above a 100–year flood elevation of the *undammed* Kickapoo River between 875 and 826 feet at various points in the valley. The KVSA cannot blithely point out "50–year elevations" versus "100–year elevations" while ignoring the difference between flood levels for the reservoir versus the free-flowing river and claim that the use of the 100–year river flood elevations is not "substantially in accordance with the plans contained in Design Memorandum No. 6" without more specific allegations, which they do not provide. Accordingly, we agree with the district court's finding that the DOT's current plan for STH 131 does not violate the WRDA.

### 2. Section 4(f) of the Transportation Act

■ Section 4(f) of the Transportation Act, codified at 49 U.S.C. § 303, provides that transportation projects "requiring the use of publicly owned land of a public park, recreation area, or wildlife and wa-

---

42 Fed.Reg. 26,951 (May 24, 1997), which protects floodplains, but did not articulate

that argument in its appellate briefs or at oral argument.

terfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)" may only be approved if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. 303(c). Since section 361(b)(4)(C)(ii) of the WRDA, which transfers the Kickapoo Reserve to the State of Wisconsin, decreed that the land "shall be preserved in a natural state and developed only to the extent necessary to enhance outdoor recreational and educational opportunities," the KVSA believes that the entirety of the Kickapoo Reserve has been formally declared recreational land for 4(f) purposes and the DOT's plan does not adequately address alternatives nor minimize harm to the reserve. The government argues that the Kickapoo Reserve is not 4(f) land, and we agree.

As described above, Section 4(f) only applies to those lands formally classified as parks, recreation areas, wildlife and waterfowl refuges, or historic sites. The KVSA does not argue that specific portions of the Kickapoo Reserve which the new route for STH 131 passes through deserve 4(f) status, but rather argues that the entire parcel should be classified 4(f). However, they fail to show that the DOT's evaluation process was arbitrary and capricious when it found that the Kickapoo Reserve was not 4(f) land. The KVSA points to a Department of the Interior letter recommending that the Kickapoo Valley Reserve be classified 4(f) land and the WRDA's

restriction that the transferred land be "preserved in a natural state and developed only to the extent necessary to enhance outdoor recreational and educational opportunities." However, it is the DOT, not the Interior Department, that makes the 4(f) determination, *see* 49 U.S.C. § 303(b), and neither the Interior Department's letter nor the WRDA's use restriction is sufficient to designate the Kickapoo Reserve as 4(f) land.

The Joint Management Plan that governs the administration of the Kickapoo Reserve is designed to "protect the Reserve's aesthetic, cultural, scenic and wild qualities," as well as "utilize sound natural resources and agricultural management practices," and "develop and maintain a Land Use Master Plan for the Reserve which includes specific conservation management plans in the areas of: agriculture, forestry, natural areas, recreation, wildlife management, education, cultural resources, and emergency response." That significant amounts of land are used for agriculture, including portions of the Reserve appropriated for STH 131 construction, indicate that the Reserve is not solely used for those recreational and/or cultural purposes, and therefore is not the type of land contemplated by Section 4(f). The KVSA fails to describe why it was arbitrary and capricious for the DOT to decide not to consider the Kickapoo Reserve as 4(f) land, either based on the multiple uses for the Reserve, or lack of the Reserve's formal designation as a park or other type of area that warrants 4(f) designation. Without such a showing, we find that the DOT did not act arbitrarily or capriciously when determining that the Kickapoo Reserve is not subject to 4(f) study.[3] *See*

---

**3.** A portion of the new STH 131 route passes through Wildcat Mountain State Park, which is under Section 4(f) protection. The KVSA

does not challenge the DOT's decision-making process regarding this section of STH 131.

818

*Overton Park*, 404 U.S. at 413–14, 92 S.Ct. 574.

### 3. Executive Order 11990

 Executive Order 11990 adds an additional component to the NEPA environmental review process. New construction is to be avoided in wetlands unless there is a finding that "1) that there is no practicable alternative to such construction, and 2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use." Exec. Order No. 11990, 42 Fed.Reg. 26,961 (May 24, 1977). The KVSA claims that this requires the DOT to choose the "lowest practicable impact." Since other alternatives in the Draft EIS were predicted to have less of an impact on wetlands, they argue, one of those alternatives *must* have been chosen over the alternative selected by the DOT, which was predicted to affect only a few acres, but has turned out to affect many more. This argument ignores language elsewhere in Executive Order 11990, which allows agencies to take into account "economic, environmental and other pertinent factors." These factors include "public health, safety, and welfare ... maintenance of natural systems, ... and other uses of wetlands in the public interest." Exec. Order No. 11990, § 5(a)-(c). The KVSA argues that design alternatives with lower design speeds were estimated to affect fewer acres of wetlands than the preferred alternative in the Final EIS, which was estimated to affect 15.26 acres (though predicted to affect only 3.8 acres in the Draft EIS). However, of the alternatives in the Draft EIS, the preferred alternative brought forward in the Final EIS had the smallest projected impact on wetlands compared to other alternatives (barring the "no-build" alternative and a plan that replaced only the bridges), and the KVSA does not challenge the DOT's decision to select its preferred alternative given the predicted wetlands impact at the Draft EIS stage, but assumes without any explanation that the other alternatives would not have had a similar increase in affected wetlands areas and would therefore have been more suitable.

Most of the wetlands impact is due to the expansion of the right-of-way. While the KVSA may argue that this is not necessary, and therefore a practicable alternative would be to use a narrower roadbed, the DOT has taken into account its public safety concerns in deciding to keep using a broader roadbed and shoulder, as it is allowed to do under § 5(a) of Executive Order 11990. Given the lack of practicable alternatives in developing an alternative plan that follows the prior right-of-way, and without any specific arguments by the KVSA that describe measures that could have been taken by the DOT during the planning or EIS drafting process, we agree with the district court's finding that the DOT properly dealt with the restrictions imposed by Executive Order 11990.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of injunctive relief to the plaintiffs.