**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**October 28, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

WESTERN WATERSHEDS PROJECT;
ROCKY MOUNTAIN WILD;
WILDEARTH GUARDIANS,

    Plaintiffs - Appellants,

v.

THOMAS VILSACK, Secretary of the
U.S. Department of Agriculture; UNITED
STATES FOREST SERVICE,

    Defendants - Appellees,

and

STATE OF WYOMING,

    Intervenor Defendant - Appellee.

No. 23-8081
(D.C. No. 1:22-CV-00214-SWS)
(D. Wyo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

Appellants Western Watersheds Project, Rocky Mountain Wild, and WildEarth

Guardians (the "Conservation Groups") challenge, under the Administrative

Procedure Act ("APA"), the Thunder Basin National Grassland 2020 Plan

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

Amendment (the "2020 Plan Amendment") adopted by Appellee United States Forest Service (the "USFS"). Specifically, the Conservation Groups argue the 2020 Plan Amendment fails to comply with the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"). The district court found that the 2020 Plan Amendment complied with both the ESA and NEPA and entered final judgment upholding it. Because we agree with the Conservation Groups that the USFS issued an unduly narrow Purpose and Need statement, failed to consider a reasonable range of alternatives, and failed to take the required "hard look" under NEPA at environmental consequences of the 2020 Plan Amendment before adopting it, we reverse the district court's decision and remand for further proceedings to determine the appropriate remedy.

## I.    BACKGROUND[1]

### A.    *Thunder Basin and Its Native Species*

This dispute concerns the USFS's efforts to manage the black-tailed prairie dog population on the Thunder Basin National Grassland ("Thunder Basin"). Thunder Basin is a sprawling grassland in northeastern Wyoming comprised of 553,000 acres of USFS-managed land and more than one million acres of land that is either state or privately managed. Because the federal land is non-contiguous, the

---

[1] Under the APA, the court considers "the whole record or those parts of it cited by a party" in determining whether agency action is unlawful. 5 U.S.C. § 706. Accordingly, this background section summarizes the pertinent facts from the administrative record as provided in the parties' appendices.

USFS works closely with Intervenor-Appellee the State of Wyoming and other local stakeholders to manage Thunder Basin.

Thunder Basin is a habitat for the black-tailed prairie dog, a "keystone species" critical to supporting the habitats of several other animal species, including the black-footed ferret. App. Vol. 3 at 138. The black-footed ferret—the only ferret species native to North America—once widely roamed the American plains but is now considered endangered under the ESA. The black-footed ferret feeds on black-tailed prairie dogs and relies on their burrows as habitat. As such, a healthy black-tailed prairie dog population is critical to the successful reintroduction of the black-footed ferret in a given area.

Like the black-footed ferret, the black-tailed prairie dog once widely roamed the great plains from Canada to Mexico, but from the late 1800s through approximately 1960, the black-tailed prairie dog population was reduced by habitat destruction due to conversion of native prairie to cropland, poisoning and shooting by ranchers and other settlers, and disease. Currently, the black-tailed prairie dog exists in only 2% of its historical range nationwide and only 0.01% of its historical range within Wyoming. Black-tailed prairie dogs are not identified as endangered or threatened under the ESA because of their ability to rebound after population stressors, including disease and poisoning. The State of Wyoming considers prairie dogs both an "agricultural pest" as well as a species of "greatest conservation need," which makes management of the prairie dogs a complicated task that requires the input of multiple local, state, and federal stakeholders. App. Vol. 4 at 9.

### B.     *Past Thunder Basin Management Plans*

For several decades, the USFS has eyed Thunder Basin as a potential habitat for reintroducing the black-footed ferret.[2] Accordingly, the USFS has issued several management plans over the last few decades concerning the black-tailed prairie dog population on Thunder Basin. These plans have consistently sought to support a black-tailed prairie dog population that could support the reintroduction of the black-footed ferret. This is not a simple task because the black-tailed prairie dog population is highly susceptible to epizootics (outbreaks) of the sylvatic plague, a bacterial disease. Plague outbreaks can rapidly decimate a population of black-tailed prairie dogs. Prairie dog populations are also vulnerable to poisoning and recreational shooting.

In 1981, the USFS adopted a grassland management plan which sought to establish Thunder Basin as a potential black-footed ferret habitat, based on its existing prairie dog population. In 2002, the USFS revised its governing grassland plan. In promulgating the 2002 amendment, approximately 50,000-acres of National Forest System land was set aside as "Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat." *Id.* at 12. Subsequently, "prairie dog management on the Thunder Basin National Grassland [became] focused on expanding prairie dog colonies to provide habitat and to promote reintroduction of black-footed ferrets." *Id.*

---

[2] Black-footed ferrets have yet to be reintroduced to Thunder Basin due to barriers including plague, difficulty managing the prairie dog population, and lack of acceptance by surrounding private landowners and communities.

In 2009, the USFS promulgated a grassland plan amendment designed to enhance prairie dog management to support the reintroduction of the black-footed ferret on Thunder Basin. This amendment introduced the Black-tailed Prairie Dog Conservation Assessment and Management Strategy ("Prairie Dog Management Strategy"). In this amendment, the USFS specifically recognized that the combined effects of poisoning and recreational shooting could prevent prairie dog population recovery. In rejecting an alternative plan that would have increased the poisoning of prairie dogs within a half mile of adjacent non-federal land, the USFS explained that the alternative would result in "poisoning a significant portion of the prairie dog population within" the contested management area, and that furthermore, "[s]hooting prairie dogs in colonies that have been previously poisoned on this large of scale would likely prevent population recovery in those colonies." App. Vol. 2 at 262–63. The Prairie Dog Management Strategy implemented categories of prairie dog habitat with specific acreage objectives and management tools designed to mitigate these risks. In particular, the USFS designated a category 1 prairie dog habitat which included a "large portion" of the black-footed ferret reintroduction habitat (Management Area 3.63), set an acreage objective of "at least 18,000 acres," prohibited recreational shooting, and limited poison use on federal lands to within a half mile of the Thunder Basin boundary and "only in cases where appropriate and available non-lethal options have been tried and found ineffective." App. Vol. 3 at 3–4.

In 2013, in response to a request from the State of Wyoming to rework the Prairie Dog Management Strategy to expand the use of poison and recreational shooting in the management areas, the USFS issued a study: the "Viability Impacts to Mountain Plover, Burrowing Owl, and Black-Footed Ferret Based on 2013 State of Wyoming Prairie Dog Strategy Amendment Request" (the "Viability Impacts Study"). App. Vol. 5 at 73–74. In the study, the USFS explained that "[p]oisoning and plague, along with other known threats, can each have a significant impact to prairie dogs. However, when these threats are combined, eradication of entire populations of prairie dogs is possible." App. Vol. 5 at 93; *see also id.* at 80 (discussing habitat loss, recreational shooting, disease, and poisoning as chief risks to black-tailed prairie dogs). The USFS noted its obligation under the ESA to "maintain viable populations of sensitive species" and concluded that "implementing the proposal from the State of Wyoming in its entirety" would "[f]ragment[] and reduc[e] prairie dog colonies further" and "preclude any future black-footed ferret reintroductions on the [Thunder Basin]." *Id.* at 93.

In 2015, the USFS amended the Prairie Dog Management Strategy. In the 2015 strategy amendment, the USFS extended the recreational shooting ban beyond category 1 to the category 2 habitat, expanded prairie dog acreage objectives, maintained limitations on the use of poison, and retained the use of plague mitigation tools. Explaining these changes, the USFS formally adopted its conclusion from the 2013 Viability Impacts study: "Poisoning and plague, along with other known threats, can have a significant impact to prairie dogs and their habitat. When these

6

threats are combined, eradication of entire prairie dog populations is possible which leads to reduced or eliminated habitat required by other species." App. Vol. 3 at 120; *see also id.* (noting "[r]ecreational shooting of prairie dogs on the [Thunder Basin] depresses colony productivity and health, fragments populations, and can reduce recovery of colonies from plague").

### C.     The 2020 Plan Amendment

In 2017, the black-tailed prairie dog population on Thunder Basin surged to a record high, with colonies spanning 75,000 acres, well beyond the USFS's then-existing goal of supporting 33,000 acres of prairie dog colonies across Thunder Basin. Shortly after, a major epizootic of the sylvatic plague spread across the black-tailed prairie dog population of Thunder Basin. This plague outbreak reduced the total black-tailed prairie dog population to approximately 1,100 acres of colonies by mid-2018.

Concerns over the plague mitigation strategies in place, the devastation caused by this plague outbreak, and ongoing disagreements with state and local stakeholders surrounding prairie dog populations on Thunder Basin led to the USFS issuing a 2020 amendment to the grassland plan (the "2020 Plan Amendment"). Among the stated goals of the 2020 Plan Amendment, as outlined in the USFS's Final Environmental Impact Statement ("FEIS"), were to increase the availability of lethal prairie dog controls and to amend how relevant portions of Thunder Basin were managed. The USFS adopted the following Purpose and Need statement for the 2020 Plan Amendment:

The purpose of this proposed plan amendment is to:

- provide a wider array of management options to respond to changing conditions;
- minimize prairie dog encroachment onto non-Federal lands;
- reduce resource conflicts related to prairie dog occupancy and livestock grazing;
- ensure continued conservation of at-risk species; and
- support ecological conditions that do not preclude reintroduction of the black-footed ferret.

Specifically, an amendment is needed to:

- revise management direction in Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat,
- adjust the boundaries of management area 3.63 to be more conducive to prairie dog management; and
- increase the availability of lethal prairie dog control tools to improve responsiveness to a variety of management situations, including those that arise due to encroachment of prairie dogs on neighboring lands, natural and human-caused disturbances, and disease.

2d Jt. Supp. App. at 39.

The USFS also set forth five alternatives for implementing the 2020 Plan Amendment. The first alternative was the "No Action" alternative, which would leave the governing management plans in place. *Id.* at 47. This alternative maintained the designation and size of Management Area 3.63. There would be no boundary management zones—zones designed to "minimize prairie dog encroachment onto non-Federal lands"—although prairie dog control would be permitted within one mile of residences, and use of poison would be permitted in the management area if the total colony acres exceed 18,000 acres. *Id.* at 36. Recreational shooting and density management would also remain prohibited in the management area.

The four action alternatives, in contrast, mostly shrunk prairie dog acreage objectives. Alternative two, the "Proposed Action," would set an objective of 10,000 acres of prairie dog colonies. *Id.* at 51. Alternative three, the "Grassland-Wide Alternative," would set an objective of 10,000–15,000 acres of prairie dog colonies. *Id.* at 57. Alternative four, the "Prairie Dog Emphasis Alternative," would set an objective of 27,000 acres of prairie dog colonies, and it would maintain many of the 2015 management strategies. *Id.* at 61. And alternative five, the "Preferred Alternative," would set an objective of 10,000 acres of prairie dog colonies. *Id.* at 65.

Each action alternative also proposed changing the designation of Management Area 3.63 and expanding the use of recreational shooting and poisoning. Specifically, each action alternative save one proposed changing the designation of the management area from Management Area 3.63, focused on ferret reintroduction, to Management Area 3.67, "Rangelands with Short-Stature Vegetation Emphasis." And each action alternative proposed expanding boundary management zones and the use of density control—which included using poison—while also increasing the extent of permissible recreational prairie dog shooting.

The USFS also responded to some proposed alternatives considered but eliminated. Relevant here, one offered proposal was to "[p]rovide 20,495 to 47,931 acres of prairie dog colonies for black-footed ferret reintroduction habitat." *Id.* at 77. The USFS explained that "[t]his suggestion was not analyzed in detail because an increase in the acreage objective for prairie dog colonies would not meet the purpose and need for the plan amendment." *Id.* The USFS added that "[o]bjective acreages up

to 33,000 acres were analyzed in the range of alternatives." *Id.* Another relevant proposal was to close Thunder Basin to livestock grazing. The USFS responded that "[a] livestock grazing closure is outside the scope of this plan amendment." *Id.* The USFS also explained that, while it did not receive any suggestions for curbing livestock grazing within the grassland, it retains the ability to make these adjustments at any time outside the grassland plan amendment process.

In its final Record of Decision ("ROD"), the USFS adopted the "Preferred Alternative," which reduced the target expanse of prairie dog colonies across Thunder Basin from 33,000 acres to 10,000 acres (with the ability to reduce the target to 7,500 acres in certain circumstances), increased the availability of poisons and recreational shooting of prairie dogs, and directed the USFS to design a new plague management strategy. The plan redesignated Management Area 3.63 as "Management Area 3.67 – Short-Stature Vegetation Emphasis." App. Vol. 5 at 103. The plan allowed the use of fumigant poisons in the boundary management zones, allowed recreational shooting throughout Thunder Basin (with a seasonal restriction in Management Area 3.67), and authorized experimental density control. The FEIS separately documented the potential impacts to the black-tailed prairie dog population that could be caused by poisons, recreational shooting, and plague. The USFS concluded that "[w]ith all activities combined," the plan was "not likely to result in a loss of viability in the planning area, nor cause a trend toward Federal listing, since the effects are expected to be localized," and that despite the impacts,

10

"it is expected that sufficient distribution of the species will be maintained on the [Thunder Basin]." 1st Jt. Supp. App. at 236 (internal quotation marks omitted).

## II.    PROCEDURAL HISTORY

In 2021, the Conservation Groups filed suit under the APA against the USFS in the United States District Court for the District of Columbia, seeking a declaratory judgment that the 2020 Plan Amendment is unlawful and an injunction setting it aside. Specifically, the Conservation Groups brought claims under the ESA and NEPA, alleging the 2020 Plan Amendment would be catastrophic both to black-tailed prairie dogs and to any efforts to reintroduce the black-footed ferret to Thunder Basin.[3]

Under the ESA, the Secretary of the Interior must list endangered and threatened species, designate critical habitat for those species, and develop a recovery plan that incorporates management actions necessary for the conservation of the species. 16 U.S.C. § 1533. The Conservation Groups alleged that the USFS violated the ESA in promulgating the 2020 Plan Amendment by failing to conserve the black-footed ferret and black-tailed prairie dog populations.

NEPA requires a federal agency undertaking a "major Federal action[]" significantly affecting the quality of the human environment" to provide "a detailed statement" addressing, *inter alia*, "reasonably foreseeable environmental effects of the proposed agency action" and "a reasonable range of alternatives to the proposed

---

[3] The Conservation Groups also brought claims under the National Forest Management Act, but those are not at issue on appeal.

11

agency action." 42 U.S.C. § 4332(2)(C)(i), (iii). NEPA also requires agencies to "take a 'hard look' at the environmental impacts of their decisions before the decision is made." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023). The Conservation Groups alleged that the USFS had provided an impermissibly narrow and unreasonable Purpose and Need statement, failed to analyze a reasonable range of alternatives, and failed to take a hard look at the effects of the 2020 Plan Amendment—particularly as it related to the combined effects of decreased acreage objectives, density control, poison, plague, and recreational shooting on the black-tailed prairie dog population.

The State of Wyoming intervened and then successfully moved for the action to be transferred to the District of Wyoming. Next, the USFS produced the agency record, and the parties briefed the merits of whether to set aside the 2020 Plan Amendment under the APA. The Wyoming district court ultimately declined to set aside the 2020 Plan Amendment, agreeing with the USFS and the State of Wyoming that first, the USFS had not violated its conservation duty under the ESA, and second, that it complied with NEPA by creating a Purpose and Need statement for the 2020 Plan Amendment that was not unreasonably narrow, analyzing a reasonable range of alternatives, and taking a hard look at the combined effects of lethal control actions. The Conservation Groups timely appealed the final judgment upholding the 2020 Plan Amendment.[4]

---

[4] We accordingly have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

On appeal, the Conservation Groups argue that: (1) the 2020 Plan Amendment violated the USFS's duty under the ESA to conserve the black-footed ferret; (2) the 2020 Plan Amendment's Purpose and Need statement was impermissibly narrow in violation of NEPA; (3) the range of alternatives analyzed by the 2020 Plan Amendment was unreasonable in violation of NEPA; and (4) the USFS failed to take a hard look, as required by NEPA, at the combined effects of decreased acreage objectives, untreated sylvatic plague, increased poisoning, and recreational shooting on black-tailed prairie dogs and their dependent species, including the black-footed ferret.

Because we agree with the Conservation Groups that the USFS failed to produce a sufficient Purpose and Need statement, failed to consider a reasonable range of alternatives, and failed take a hard look at the combined effects of decreased acreage objectives, density control, plague, poison, and recreational shooting as required by NEPA, we hold the 2020 Plan Amendment unlawful on that basis and do not reach the Conservation Groups' ESA claim.[5]

### III.    STANDARD OF REVIEW

We review a district court's resolution of APA claims de novo, applying the same deferential standard toward the agency's decisions that the district court

---

[5] We are unable to determine whether the USFS violated its duty under the ESA to conserve the black-footed ferret in the absence of a sufficiently broad Purpose and Need statement, analysis of a reasonable range of alternatives, or a sufficiently hard look at the combined impacts of decreased acreage objectives, density control, plague, poisoning, and shooting on black-tailed prairie dog populations.

applies. *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014); *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). We will not overturn an agency's decision "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Utah Env't Cong.*, 443 F.3d at 739 (quoting 5 U.S.C. § 706(2)(A)).

To avoid a finding that an agency action is arbitrary and capricious, "the agency cannot (1) rely on factors deemed irrelevant by Congress; (2) fail to consider important aspects of [the] problem; (3) present an explanation that is either implausible or contrary to the evidence; or (4) reach a decision that is not supported by substantial evidence in the [administrative] record." *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1058 (10th Cir. 2023) (alterations in original) (internal quotation marks omitted). If the reviewing court concludes that an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court should hold the agency action to be unlawful and set it aside. 5 U.S.C. § 706(2)(A).

We "accord agency action a presumption of validity," and therefore, "the burden is on the petitioner to demonstrate that the action is arbitrary and capricious." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quotation marks omitted). "We do not 'substitute [our] judgment for that of the agency,' and we do not 'supply a reasoned basis for the agency's action that the agency itself has not given.'" *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793–94 (10th Cir. 2010)

14

(alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## IV.    ANALYSIS

### A.    *Purpose and Need Statement*

Agencies are required to include "a statement that briefly summarizes the underlying purpose and need for the proposed agency action" in environmental impact statements. 40 C.F.R. § 1502.13. "[A]gencies have considerable discretion to define the purposes and objectives of a proposed action, as long as they are reasonable." *Wyoming*, 661 F.3d at 1244–45. However, "courts will not allow an agency to define the objectives so narrowly as to preclude a reasonable consideration of alternatives." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002).

We have previously held that a statement of objectives would be unreasonably narrow if it would permit the selection of only one river crossing location to improve traffic flow, without considering the efficacy of other possible locations. *Davis v. Mineta*, 302 F.3d 1104, 1119–20 (10th Cir. 2002), *abrogated on other grounds by Diné Citizens*, 839 F.3d 1276. We explained this narrow purpose and need statement "foreclosed a reasonable consideration of alternatives," especially "given the more general overarching objective of improving traffic flow in the area." *Id.* at 1119. Where the record suggested "potentially viable alternatives" of alternative river crossings, a purpose and need statement that "mandate[d]" a single location for the crossing was "contrary to the mandates of NEPA." *Id.* at 1119–20.

15

By contrast, a purpose and need statement which narrowed an energy project's scope to creating a means to provide natural gas to Vancouver Island to meet increased electricity needs was sufficiently broad, even where a conservation group argued it "compelled [the agency] to ignore other ways to meet that need for electrical power." *Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1324 (10th Cir. 2004). This was because the agency, in discussing a no-action alternative, described the other methods of increasing electrical power—alternative fuels, clean-coal, solar, wind, hydroelectric—and explained why each was not a feasible alternative. *Id.* The agency also explained in its final environmental impact statement why another plan to replace underwater electric cables to reduce the need for energy generation capacity on the island was not feasible due a lack of sponsors and excessive cost. *Id.*

Here, as an initial matter, the parties agree the "purpose" section of the Purpose and Need statement is sufficiently broad under NEPA. The statement identifies the following five purposes for the 2020 Plan Amendment: "provide a wider array of management options to respond to changing conditions," "minimize prairie dog encroachment onto non-Federal lands," "reduce resource conflicts related to prairie dog occupancy and livestock grazing," "ensure continued conservation of at-risk species," and "support ecological conditions that do not preclude reintroduction of the black-footed ferret." 2d Jt. Supp. App. at 39. But the Conservation Groups argue that the Purpose and Need statement is unreasonably narrow and violates NEPA because the "need" section narrowly focuses on increasing lethal prairie dog control tools without considering whether doing so is a

16

sound idea. The Conservation Groups further criticize the Purpose and Need

statement for failing to acknowledge the USFS's duty to protect the black-footed

ferret under the ESA.

The USFS's Purpose and Need statement identifies three needs for the 2020

Plan Amendment: "revise management direction in Management Area 3.63," "adjust

the boundaries of management area 3.63 to be more conducive to prairie dog

management," and "increase the availability of lethal prairie dog control tools to

improve responsiveness to a variety of management situations, including those that

arise due to encroachment of prairie dogs on neighboring lands, natural and human-

caused disturbances, and disease." *Id.* We agree with the Conservation Groups that

by identifying a need of the 2020 Plan Amendment as to "increase the availability of

lethal prairie dog control tools to improve responsiveness to a variety of management

situations," *id.*, the USFS has defined the Purpose and Need statement so narrowly as

to "preclude a reasonable consideration of alternatives," *Citizens' Comm. to Save Our

Canyons*, 297 F.3d at 1030.

In the FEIS, the USFS acknowledges that "[a]s a Federal agency, [it] has [a]

responsibility to contribute to recovery of threatened and endangered species

according to section 7 of the [ESA]." 2d Jt. Supp. App. at 30. It further discusses how

prairie dog management on Thunder Basin has "focused on expanding prairie dog

colonies to provide habitat and to promote reintroduction of black-footed ferrets." *Id.*

But despite recognizing its obligation under the ESA to contribute to recovery of

endangered and threatened species, and the particular need to support black-tailed

17

prairie dog populations on Thunder Basin to enable the reintroduction of the endangered black-footed ferret, the USFS's Purpose and Need statement limits the consideration of alternatives to those that will "increase the availability of lethal prairie dog control tools." *Id.* at 39. Each proposed action alternative accordingly increases the availability of lethal control methods, including poisoning and shooting.[6] The record makes clear that these lethal methods will impact prairie dog populations. *See* 1st Jt. Supp. App. at 23840. As discussed *infra* Section IV.B, there are viable alternatives to expanding the use of lethal controls, but none of the proposed actions consider these alternatives. *See Davis*, 302 F.3d at 1119–20. The Purpose and Need statement thus precluded the USFS from considering a "reasonable consideration of alternatives," in violation of NEPA. *Id.*

Additionally, unlike the agency in *Fuel Safe Washington*, the USFS does not provide an adequate explanation in its discussion of why expanding lethal control options was the only viable choice. *See* 389 F.3d at 1324. The USFS argues that it explained nonlethal control methods such as translocation and vegetation barriers were "inefficient and costly," local communities were resistant to them, and they were "impractical to prevent encroachment on sufficient scales." 1st Jt. Supp. App. at 103, 170. But these statements are contradicted by evidence elsewhere in the FEIS

---

[6] For this reason, we reject the USFS's argument that the Purpose and Need statement is sufficiently broad because the action alternatives "considered alternatives that varied in terms of colony acreage objectives, management area boundaries, and plague mitigation measures." USFS Br. at 41. The USFS does not dispute that each action alternative expands the use of poisoning and other lethal control methods. *See id.*

that the USFS had not attempted translocation since 2011 and had relied on third-party studies to assess the effect of vegetation barriers. *See* App. Vol. 4 at 71, 75. The USFS further argues it concluded the 2017–18 boom-and-bust population cycle "demonstrated that the existing strategy and inflexibility hindered the [USFS's] ability to respond effectively to rapid prairie dog colony changes." USFS Br. at 42 (citing 1st Jt. Supp. App. at 103). But this reasoning is likewise belied by the USFS stating elsewhere in the FEIS it "elected not to use plague mitigation tools" during that time. App. Vol. 4 at 19; *see also* Appellants' Supp. App. at 32. Finally, the USFS's failure to take a hard look at the combined impacts of decreased acreage objectives, density control, plague, poisoning, and shooting, *see infra* Section IV.C, further undermines the conclusion that expansion of lethal controls was the only option.[7]

Given the USFS's "general overarching objective[s]" of both honoring its multiple-use mandate and its responsibility to contribute to the recovery of endangered species under the ESA, its Purpose and Need statement—which narrowly directed the USFS to consider only action alternatives that expanded the use of lethal

---

[7] The dissent disagrees with our application of *Fuel Safe Wash. v. FERC*, asserting it supports the conclusion that the USFS adequately considered other alternatives in the no-action alternative. Dissent at 5 (citing 389 F.3d 1313, 1324 (10th Cir. 2004)). But for the reasons discussed, the problem is not that the USFS failed to include non-lethal options in the no-action alternative (as we note *supra* at 8–9, the no-action alternative left existing management plans in place), but that the USFS fails to provide an adequate explanation as to why it rejected those alternatives—unlike in *Fuel Safe Washington*. *See supra* at 16–17.

controls—precluded a reasonable consideration of alternatives and thus violates NEPA. *Davis*, 302 F.3d at 1119.

### B.    *Reasonable Range of Alternatives*

The reasonable range of alternatives section is the "heart" of an environmental impact statement. 40 C.F.R. § 1502.14. "NEPA requires that the Agencies '[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.'" *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002) (alteration in original) (quoting 40 C.F.R. § 1502.14(a)). "The range of alternatives that the agency must consider is not infinite, of course, but it does include all reasonable alternatives to the proposed action. The APA's reasonableness standard applies both to which alternatives the agency discusses and the extent to which it discusses them." *Id.*

"The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009). "[O]nce an agency establishes the objective of the proposed action—which it has considerable discretion to define—the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not 'reasonable.'" *Biodiversity Conservation All.*,

20

762 F.3d at 1083 (alterations in original) (quotation marks omitted). Similarly, NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (alteration in original) (quotation marks omitted).

We have previously held an agency fails to consider a reasonable range of alternatives when it fails to consider a "reasonable management possibility" in a way that prevents it from taking stock of "all reasonable options before it" when selecting an alternative. *Richardson*, 565 F.3d at 711. In *Richardson*, plaintiffs challenged the Bureau of Land Management's ("BLM") promulgation of a management plan that opened 96.9% of the plan area to minerals development. *Id.* at 690. BLM considered this plan alongside one other option, which closed 17% of the land to minerals development. *Id.* at 709. BLM had eliminated from consideration plan options that would have enacted a blanket ban on development in the plan area, and plaintiffs argued that BLM violated NEPA by not analyzing a management plan that closed more of the plan area to development. *Id.* at 690, 709. We agreed, holding that analyzing such an alternative comported with BLM's statutory mandate for land management under the multiple use principle, especially given this alternative's effect on conservation, one of the multiple uses. *Id.* at 710. We further concluded that considering a no-development option comported with BLM's purpose and need statement for the project, which "[did] not take development of the [management area] as a foregone conclusion." *Id.* at 711. "To the contrary, the question of whether

21

*any* of the lands in the plan area are 'suitable' for [] development is left open, and is precisely the question the planning process was intended to address." *Id.*

Similarly, we have previously held that the USFS violated NEPA by eliminating from detailed consideration an alternative that would have preserved land for conservation on National Forest lands in Colorado (the "conservation alternative"). *High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1224–27 (10th Cir. 2020). The broader objectives of the project as outlined in the USFS's purpose and need statement included conserving Colorado roadless areas, which included "important fish and wildlife habitat," while "not foreclosing opportunities for exploration and development of coal resources" in the area. *Id.* at 1224; *see also id.* (noting the project's purpose and need statement "echoes the Forest Service's general statutory mandate of balancing multiple possible uses"). The USFS eliminated the conservation alternative from contention "based solely on the fact that [it] would protect more land and provide access to fewer tons of coal" than other alternatives." *Id.* We held this explanation failed to address the USFS's own plan objectives and "conflict[ed] with the agency's obligation under NEPA to provide legitimate consideration to alternatives that fall between the obvious extremes." *Id.* (internal quotation marks omitted). We accordingly concluded that the elimination of the conservation alternative was arbitrary and capricious because the USFS had failed to provide "a logically coherent explanation for its decision." *Id.* at 1227.

22

By contrast, we held the USFS considered a reasonable range of alternatives when analyzing the size of a ski resort structure to be built on Forest Service land. *Citizens' Comm. to Save our Canyons*, 297 F.3d at 1031–32. The plaintiff argued the USFS restricted the range of alternatives by not considering smaller buildings or alternate locations. *Id.* at 1031. But because the record illustrated that the proposals for smaller structures, moving the structure to a different mountain, or building the structure underground were both infeasible and failed to meet project objectives of improving recreational use while balancing environmental interests, we concluded the range of alternatives considered was reasonable. *Id.* at 1031–32.

Here, the Conservation Groups assert that the 2020 Plan Amendment failed to consider a reasonable range of alternatives in violation of NEPA because the USFS did not analyze any alternative that did not increase lethal prairie dog control. By way of example, the Conservation Groups argue the USFS failed to consider the "eminently reasonable alternative" of altering or reducing livestock grazing. Appellant's Br. at 40.[8] The USFS argues, and Wyoming agrees, that it considered a reasonable range of alternatives in promulgating the 2020 Plan Amendment.

---

[8] The USFS argues the Conservation Groups forfeited the argument about livestock grazing allotments by not making it before the district court. Wyoming argues this argument was waived because the Conservation Groups did not raise it before the agency. We disagree.

The Conservation Groups argued before the district court that the USFS failed to consider a reasonable range of alternatives because each alternative degraded "the previously[] designated black-footed ferret reintroduction site," in violation of its duties under the ESA. Petitioners' Opening Brief, *W. Watersheds Project v. Vilsack*, No. 1:22-cv-00214-SWS (D. Wyo. May 2, 2023), ECF No. 66 at 41. The

As discussed *supra* Section IV.A, the USFS's Purpose and Need statement was impermissibly narrow in limiting the range of alternatives considered by the USFS to only those that expanded the use of lethal controls. But beyond that, the USFS considered only alternatives that maintained or shrunk prairie dog acreage objectives, reclassified Management Area 3.63 to a grasslands emphasis, and expanded the use of both poison and recreational shooting. This range of alternatives was not "reasonable" considering the Purpose and Need statement which emphasized, *inter alia*, the need to "provide a wider array of management options to respond to changing conditions," "ensure continued conservation of at-risk species," and "support ecological conditions that do not preclude reintroduction of the black-footed ferret." 2d Jt. Supp. App. at 39. Despite these overarching purposes, which included conservation, none of the action alternatives focused on strategies that would expand acreage objectives or limit livestock grazing allotments. Agencies fail to comply with NEPA when they fail to consider reasonable alternatives that comport with the

---

Conservation Groups maintain this argument on appeal but discuss for the first time on appeal an example of a reasonable alternative the USFS did not consider concerning livestock grazing allotments. We agree with the Conservation Groups that this is not a new argument or a new theory, but an additional example. *See Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 885–86 (10th Cir. 2016). Further, in the FEIS, the USFS notes it received comments suggesting Thunder Basin be closed to livestock grazing, but it dismisses that option as outside of the scope of the Purpose and Need statement. The USFS further notes it could have considered reducing livestock grazing allotments but determined it could adjust these allotments without a plan amendment. Under these circumstances, we consider the issue properly before us.

agency's purpose and need statement. *See High Country Conservation Advocs.*, 951 F.3d at 1225–27; *Richardson*, 565 F.3d at 710–11.

The USFS briefly acknowledges in the FEIS that it considered but declined to work up an alternative which would expand prairie dog acreage objectives. However, it states only that "[t]his suggestion was not analyzed in detail because an increase in the acreage objective for prairie dog colonies would not meet the purpose and need for the plan amendment." 2d Jt. Supp. App. at 77. While agencies are not obligated to consider alternatives that do not meet the purpose and need statement, *see Biodiversity Conservation All.*, 762 F.3d at 1083, the USFS offered no explanation as to why increasing the acreage objective for prairie dog colonies would not meet the stated purpose of "continued conservation of at-risk species," 2d Jt. Supp. App. at 39. This explanation is not "logically coherent," and therefore insufficient. *See High Country Conservation Advocs.*, 951 F.3d at 1227. Similarly, the USFS's refusal to consider an alternative which altered grazing management as "outside the scope" of the 2020 Plan Amendment fails to explain why such an alternative would not fit the Purpose and Need statement's purpose of "continued conservation," especially given the commenter's assertion that such an alternative could "benefit . . . wildlife." 2d Jt. Supp. App. at 39, 77.

By failing to consider alternatives that ensured conservation—a purpose identified in the Purpose and Need statement—the USFS failed to address questions

25

"the planning process was intended to address." *Richardson*, 565 F.3d at 711.[9] In

combination with the USFS's failure to take a hard look at the combined impacts of

decreased acreage objectives, density control, poison, plague, and shooting on prairie

dog populations, discussed below, the range of alternatives considered was not

reasonable.

### C.    *Hard Look*

During a federal agency's decisionmaking processes, NEPA requires agencies

to "take a '"hard look" at environmental consequences'" of a proposed action.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)); *see also Ctr. for Biological

Diversity*, 72 F.4th at 1178 (same). "[W]hen assessing whether agencies took a 'hard

look,' we are applying the APA standard of review, determining whether agencies'

actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.'" *Diné Citizens Against Ruining Our Env't v. Haaland*,

59 F.4th 1016, 1034 n.7 (10th Cir. 2023) (quoting 5 U.S.C. § 706(2)(A)). Therefore,

in taking a "hard look," "an agency must examine[] the relevant data and articulate[]

---

[9] The dissent asserts the USFS was not required to consider conservation in its range of alternatives because, "NEPA does not mandate any particular substantive result," only "the necessary process that must accompany agency action." Dissent at 7 (quoting *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1179 (10th Cir. 2023)). But as discussed, one of the USFS's stated purposes in the Purpose and Need statement was to "ensure continued conservation." 2d Jt. Supp. App. at 39. Thus, the USFS was required under NEPA to consider alternatives that comported with that stated objective. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1226–27 (10th Cir. 2020).

a rational connection between the facts found and the decision made." *Richardson*, 565 F.3d at 713 (alterations in original) (internal quotation marks omitted).

When "considering whether the agency took a 'hard look,' we consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument." *Id.* at 704. The agency "must consider the direct, indirect, and cumulative environmental impacts of the proposed action." *Diné Citizens*, 59 F.4th at 1034. "Our deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Id.* at 1029–30 (quotation marks omitted). "[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Ctr. for Biological Diversity*, 72 F.4th at 1178 (quotation marks omitted). However, "[c]onclusory statements regarding impacts without adequate discussion do not meet the required 'hard look' under NEPA." *Id.*

Finally, "[i]t is axiomatic" that when an agency "materially" changes or "contradict[s]" previous findings, "the agency . . . need[s] to provide a 'reasoned explanation' for the difference." *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1232 (10th Cir. 2016) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "[U]nexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA." *Id.* (alteration in original) (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc)).

The Conservation Groups argue that the USFS, in promulgating the 2020 Plan Amendment, failed to take a hard look at the combined impacts of decreased acreage objectives, density control, increased poisoning, increased recreational shooting, and unmitigated plague events on prairie dog populations, contradicting prior determinations the USFS made in 2009, 2013, and 2015. The USFS and State of Wyoming respond that the Conservation Groups' argument mischaracterizes the FEIS and ROD's conclusions concerning the impacts of these actions. We agree with the Conservation Groups.

In the years before the 2020 Plan Amendment, the USFS repeatedly shaped its policy choices considering its documented concerns about the combined effects of poisoning, plague, and recreational shooting on prairie dog populations. In 2009, when the USFS first adopted the Prairie Dog Management Strategy, it supported its chosen plan by concluding that "[s]hooting prairie dogs in colonies that have been previously poisoned on this large of scale would likely prevent population recovery in those colonies." App. Vol. 2 at 263. In the 2013 Viability Impacts Study, the USFS explained that habitat loss, recreational shooting, poisoning, and plague were the chief threats to prairie dog populations and that these threats in combination could cause "eradication of entire populations of prairie dogs."[10] App. Vol. 5 at 93. And in

_____

[10] The State of Wyoming argues that this 2013 conclusion is irrelevant because it comes from a "draft analysis" that "[t]he Forest Service did not adopt." Wyo. Br. at 48. The USFS, for its part, makes no such argument. But the language the Conservation Groups identify in the 2013 document—namely, that "when these threats are combined, eradication of entire populations of prairie dogs is possible,"

2015, when the USFS expanded its protections for prairie dogs on Thunder Basin in an amendment to the Prairie Dog Management Strategy, it explained so in part by discussing the risks of recreational shooting, poisoning, and plague on prairie dog populations, concluding again: "*When these threats are combined*, eradication of entire prairie dog populations is possible . . . ." App. Vol. 3 at 120 (emphasis added).

The USFS argues that it considered all potential impacts of these management strategies in detail, analyzing "all activities combined, along with resource protection measures and plan components." USFS Br. at 57 (emphasis omitted) (quoting 1st Jt. Supp. App. at 236). The USFS claims that it "concluded that all alternatives 'may adversely impact individual[]' prairie dogs, 'but [are] not likely to result in a loss of viability in the planning area, nor cause a trend toward Federal listing,' because 'the effects are expected [to] be localized.'" *Id.* (alterations in original) (quoting 1st Jt. Supp. App. at 236). While the USFS provides a citation in its response brief which it

_____

App. Vol. 5 at 93—is adopted essentially verbatim in the 2015 amendment to the Prairie Dog Management Strategy: "When these threats are combined, eradication of entire prairie dog populations is possible . . . ," App. Vol. 3 at 120. We therefore disagree that the analysis was never adopted.

But even if we agreed with the State of Wyoming that the Viability Impacts Study is a "draft analysis," the USFS is still required to explain the inconsistency of that conclusion with the 2020 Plan Amendment. True, "inconsistencies with preparatory, informal, or internal agency documents may not trigger the requirement for 'further justification.'" *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1232 n.6 (10th Cir. 2016) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). But that is the case only when the only identified inconsistency is between an informal document and a formally promulgated one. *See id.* Here, the Viability Impacts Study is consistent with statements made before and after by the USFS concerning the combined effects of threats to the black-tailed prairie dog population. The issue here is the inconsistency between the USFS's positions in 2009, 2013, and 2015 and the 2020 Plan Amendment.

asserts supports that conclusion, nowhere in the cited material is there any support for the idea these actions were considered in *combination*. *See* 1st Jt. Supp. App. at 228–37.

Specifically, the cited material contains separate analyses of the effects of decreasing prairie dog acreage objectives, density control, recreational shooting, poison, and plague. *See, e.g.*, 1st Jt. Supp. App. at 229 ("Recreational shooting can negatively affect black-tailed prairie dog because of its sensitivity to social disruption. However, studies have shown that populations are generally capable of recovering from low numbers once shooting abates . . . ." (citation omitted)). These analyses are followed by the conclusory assertion that "all activities combined" are "not likely to result in a loss of viability in the planning area." *Id.* at 236 (internal quotation marks omitted). But there is no analysis or discussion of why or how the combined effects of reduced prairie dog acreage objectives, density control, plague, poison, and shooting will not result in a loss of viability to prairie dog populations. As such, it is entirely unclear from the FEIS and ROD whether the *combined* effects of reduced acreage objectives, density control, poison, plague, and shooting were analyzed or even considered by the USFS. This absence is stark given the USFS's prior conclusions that the combined threats of habitat loss, poison, plague, and shooting could lead to the "eradication" of prairie dog populations on Thunder Basin. App. Vol. 3 at 120. The USFS's assertion in the 2020 Plan Amendment that "all activities combined" are "not likely to result in a loss of viability in the planning

area" is nothing more than a "[c]onclusory statement[]" that fails to satisfy NEPA's hard look requirement. *Ctr. for Biological Diversity*, 72 F.4th at 1178.

After oral argument, the USFS submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j), directing the court to additional citations in the record it argues "support[] the [USFS's] hard look at combined effects." ECF No. 81 at 1. The additional citations provided in the USFS's Rule 28(j) letter are unavailing.[11] First, the USFS identifies citations in the record supporting the propositions that, in designing the 2020 Plan Amendment, it expected "adverse effects on prairie dogs and associated species . . . to be localized" and it aimed to "provide ecological conditions to maintain vulnerable species." ECF No. 81 at 1 (citing App. Vol. 5 at 28–29 and 1st Jt. Supp. App. at 259).[12] But nowhere in the cited material does the USFS explain

---

[11] In the Rule 28(j) letter, the USFS reiterates its citation to pages 27338 through 27347 of the administrative record (which appears on pages 228 through 237 of the first joint supplemental appendix, as cited in the USFS's response brief, and pages 743 through 752 of the second joint supplemental appendix, as cited in the Rule 28(j) letter). For the reasons already explained, that citation does not provide support for the argument the USFS analyzed the combined impact of poisoning, plague, and shooting on prairie dog populations.

[12] To further support this proposition, the USFS also attaches to its Rule 28(j) letter additional pages from the administrative record that were not previously included in any of the appendices. *See* ECF No. 81, Attachment 1 at 9–11, 15–17, and 21. These citations are similarly unavailing. These pages consist of the USFS's responses to comments urging the USFS not to adopt the 2020 Plan Amendment. In responding to the comments, the USFS reiterates its position that the 2020 Plan Amendment was designed to "maintain ecological conditions" for the prairie dogs on Thunder Basin and that "no substantial adverse impacts" were expected. ECF No. 81, Attachment 1 at 10; *see also id.* at 16–17, 21 (similar). But the USFS's responses to the comments do not address the USFS's earlier conclusions that the combined

*why* the 2020 Plan Amendment, which the USFS states is expected to lead to "[a]dverse effects to prairie dogs," is "not expected to lead to loss of viability" despite the fact the USFS had previously concluded the combined impacts of habitat loss, poisoning, plague, and shooting could do exactly that. 1st Jt. Supp. App. at 259.

The USFS next explains it reached this determination by "evaluat[ing] the relative impact of various factors on prairie dog colonies," including reduced acreage objectives, plague, poisoning, and shooting, as well as components designed "to ensure that localized impacts would not accumulate to threaten the viability of vulnerable species." ECF No. 81 at 2 (citing 2d Jt. Supp. App. at 592–603, 734–38; App. Vol. 5 at 101).[13] The additional citations to the FEIS again illustrate the USFS *separately* analyzed the effects of decreased acreage objectives, density control, plague, poisoning, and shooting, but do not contain any analysis showing the USFS considered their effects in combination. *See* 2d Jt. Supp. App. at 592–603, 734–38. And the additional citation to the ROD shows the USFS concluded that "[i]n combination with other ecosystem and species-specific plan components," the new prairie dog management scheme "was found to maintain ecological stability." App.

---

effects of poison, plague, and shooting could lead to "eradication" of the prairie dogs, nor do the USFS's responses explain how or why the USFS changed its position.

[13] The USFS also cites the record for the proposition that it will "monitor impacts and conduct additional analyses if conditions change." ECF No. 81 at 2 (citing 2d Jt. Supp. App. at 94, 422). But this commitment to ongoing monitoring says nothing about the USFS's baseline conclusion that combined effects of habitat loss, poisoning, plague, and shooting are not expected to affect the viability of prairie dog populations, in direct contrast to earlier conclusions.

Vol. 5 at 101. But again, there is no explanation of why these components in combination—which include the expansion of density control, recreational shooting and poisoning—are no longer expected to lead to the eradication of the prairie dogs. *See id.* Finally, the USFS identifies pages it argues support the proposition that it compared how the proposed alternatives "affect vegetation and wildlife" and "satisfy the amendment's purpose of ensuring species viability." ECF No. 81 at 2 (citing 2d Jt. Supp. App. at 82–83, 100–58; App. Vol. 5 at 99). But nowhere in these detailed analyses of the proposed alternatives' effects on vegetation and wildlife on Thunder Basin is there any discussion of the combined impacts of decreased acreage objectives, density control, poison, plague, and shooting, as articulated in earlier USFS plans.

The USFS concludes in its Rule 28(j) letter that these cited analyses "necessarily involved analyzing the aggregate effects of all plan components," "inherently considered the combined effects of activities," and "compared the [2020 Plan Amendment's] combined effects to prior management." *Id.* at 1–2. But as discussed above, the actual cited material does not contain this analysis—instead, it only further documents the USFS's analysis of individual effects and its conclusion that the 2020 Plan Amendment would not lead to a loss of species viability. The USFS's analysis contains no indication the USFS considered the combined effects of decreased acreage objectives, density control, plague, poisoning, and shooting on black-tailed prairie dog populations. Again, we cannot rely on "post-hoc rationalization concocted by counsel in briefs or argument." *Richardson*, 565 F.3d

33

at 704. More troublingly, in the cited material, the USFS fails to provide any explanation, much less a "reasoned" one, for the change from its previous conclusion that the combined effects of habitat loss, poisoning, plague, and shooting could lead to the eradication of the prairie dogs. *Cure Land, LLC*, 833 F.3d at 1232 (quoting *Fox Television Stations*, 556 U.S. at 515). This "[u]nexplained conflicting finding[] about the environmental impacts" of the 2020 Plan Amendment violates the APA. *See id.* (quoting *Organized Vill. of Kake*, 795 F.3d at 969).

Similarly, the USFS also argues in its briefing that its contrary conclusion is the result of updated scientific information, including "the rapid colony expansion and subsequent contraction in 2017 and 2018," but the USFS never actually provides an explanation along those lines in its FEIS or ROD. USFS Br. at 59. The USFS does discuss, in its FEIS data, prairie dog population recovery after separate incidents of epizootics, poisoning, and recreational shooting. The USFS explains that "[f]ollowing an epizootic or poisoning, prairie dogs can reproduce and recover relatively quickly," 1st Jt. Supp. App. at 218, and "[w]hile colonies typically regrow after a season of shooting, shot colonies grow at lower rates than un-shot colonies and do not return to their previous population size within 1 year," *id.* at 221. After this discussion, along with citations to scientific literature, the USFS notes that "[a]s a result of limited use of control measures, colonies have typically grown in years between plague epizootics." *Id.* at 223. The USFS also explains that "[a]nthropogenic control efforts have affected prairie dog colony area to a far lesser degree than plague since 2001." *Id.*

But these data still contradict the USFS's conclusion first stated in 2013 that "when these threats are *combined*, eradication of entire populations of prairie dogs is possible." App. Vol. 5 at 93 (emphasis added); *see also* App. Vol. 3 at 120 (adopting this conclusion in the 2015 strategy amendment). There is no explanation that we can glean from the administrative record as to why the combined effects of decreased acreage objectives, density control, recreational shooting, poison, and plague are no longer considered to create the risk of eradication. There may well be a sound reason for this disparate conclusion in light of additional data gathered during the 2017–18 plague outbreak. But the record does not indicate the reason for this discrepancy because there is no discussion of the combined effects of decreased acreage objectives, density control, plague, poison, and recreational shooting on prairie dog colonies.[14]

While it is true that we do not "decide the propriety of competing methodologies" but rather "determine simply whether the challenged method had a

---

[14] Similarly, the USFS argues that "under the prior management scheme, plague events wiped out 99 percent of prairie-dog-colony extent in the management area, yet the species continues to persist," and that the 2020 Plan Amendment is intended to "produce a better managed and healthier prairie dog population" by reducing the size of the acreage objective. USFS Br. at 60. But neither the FEIS nor ROD addresses why—especially given the devastating impact of the 2017 plague, which occurred before the wider use of poisons or recreational shooting enabled by the 2020 Plan Amendment—the combined effects of habitat loss, plague, poison, and shooting do not create the risk of "eradication" the USFS previously identified in 2013 and 2015. It may be true that, in light of information learned during the 2017–18 plague outbreak, the concerns expressed in prior years regarding the combined impacts of plague, poison, and recreational shooting are no longer scientifically sound. But this is never explained in the FEIS or ROD.

rational basis and took into consideration the relevant factors," here, the agency has

not shown it considered the relevant factors. *Silverton Snowmobile Club v. U.S.*

*Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006) (quotation marks omitted). And we

cannot consider "post-hoc rationalization[s] concocted by counsel in briefs or

argument." *Richardson*, 565 F.3d at 704.[15]

"[O]nce environmental concerns are adequately identified and evaluated by the

agency, NEPA places no further constraint on agency actions." *Citizens' Comm. to*

*Save Our Canyons v. Krueger*, 513 F.3d 1169, 1179 (10th Cir. 2008) (alteration in

original) (quotation marks omitted). Here, the relevant consideration of whether the

---

[15] The dissent would conclude that the expansion of lethal control methods was a "reasoned departure" from previous management strategies in light of the 2017–18 plague outbreak, citing part of the USFS's effects analysis. *See* Dissent at 9–10. But in that cited material, the USFS writes that "[i]t is possible that managing toward lower colony extents or use of density control as described in the Proposed Action and the Grassland-wide alternatives could maintain smaller colonies and limit the spread of sylvatic plague on [Thunder Basin], *but there is not currently scientific literature or monitoring data to demonstrate support for that hypothesis*." 2d Jt. Supp. App. at 744 (emphasis added). This underscores that one of the USFS's explanations for increasing lethal controls in the 2020 Plan Amendment—to better manage prairie dog colony sizes and therefore decrease the spread of sylvatic plague—was not supported by scientific literature or data. In turn, the USFS's failure to consider the combined impacts of decreased acreage objectives, density control, recreational shooting, poison, and plague on prairie dog populations is concerning due to its past conclusions highlighting the threat caused by the combination of these forces, which were supported by scientific literature and data.

Relatedly, the dissent highlights portions of the FEIS to argue that its "path may reasonably be discerned" despite the lack of clarity in its combined effects analysis. Dissent at 10. But the sections of the FEIS cited by the dissent—the prairie dogs' population bounce-back after the plague, the aim to mitigate plague through smaller colony sizes, and the fact the USFS will be in charge of poisoning—are further examples of places the USFS analyzed the individual effects of poisoning and plague without addressing their combined impact.

combined effects of decreased acreage objectives, density control, plague, poison, and recreational shooting will cause substantial harm—or even eradication—to black-tailed prairie dog communities was not assessed by the USFS. Accordingly, we hold the 2020 Plan Amendment is unlawful on the grounds that the USFS did not take a hard look at the issue of the combined impact of decreased acreage objectives, density control, recreational shooting, poison, and plague on prairie dog populations and must be set aside.

### D.    Remedy

Having determined that the 2020 Plan Amendment is unlawful, we must now determine the appropriate remedy. The Conservation Groups briefly argue that the USFS's violation of NEPA warrants vacatur. The USFS responds in passing that remand to the district court is appropriate.

This court has adopted a two-prong, fact-sensitive test for determining whether vacatur is the appropriate remedy for an APA violation: "(1) 'the seriousness of the [agency action's] deficiencies (and thus the extent of doubt whether the agency chose correctly),' and (2) 'the disruptive consequences of an interim change that may itself be changed.'" *Diné Citizens*, 59 F.4th at 1049 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Moreover, we have previously explained that "[a]pplication of the *Allied-Signal* factors requires a fact-intensive inquiry that is typically left to the discretion of the district court." *Id.*

Because the *Allied-Signal* factors were not considered by the district court, and because the parties do not provide any discussion of the factors on appeal, we remand

to the district court with instructions to apply these factors in the first instance to determine the appropriate remedy.

## V.    CONCLUSION

For these reasons, we find the 2020 Plan Amendment is unlawful and must be set aside. We therefore REVERSE the district court's contrary determination and REMAND for consideration of the appropriate remedy.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

23-8081, *Western Watersheds Project v. Vilsack*

**TYMKOVICH**, Circuit Judge, dissenting.

Boom and bust population cycles in black-tailed prairie dogs have proven the Forest Service's existing Thunder Basin management plans to be ineffective. Accordingly, the Forest Service proposed amending these previous management decisions to expand its available management tools. The majority rejects this latest amendment. But it misses the forest for the trees. Sticking to a plan that has proven to be ineffective makes little sense and amending such plans—even considerably—can hardly be arbitrary or capricious. The Forest Service, based on its experience with the failed plan, properly identified and explained how it believed the plan must change. It then analyzed a reasonable range of alternatives that accomplished its purposes and needs. In my view, the Forest Service took a statutorily adequate "hard look" at this shift in management direction. I would affirm.

## I.    Purposes and Needs

The effects analysis is correctly called the "heart" of the NEPA analysis. 40 C.F.R. § 1502.14. Agencies need not consider alternatives which do not meet their purposes and needs, and agencies "have considerable discretion to define the purposes and objectives of a proposed action, as long as they are reasonable." *Wyoming v. Dep't of Agric.*, 661 F.3d 1209, 1244–45 (10th Cir. 2010). But we "will not allow an agency to define the objectives so narrowly as to preclude a reasonable consideration of alternatives." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002).

The majority first rejects the 2020 Plan Amendments because the purpose and need statement forecloses consideration of reasonable alternatives. Specifically, the majority (and the parties) accepts that the purposes are sufficiently broad, but rejects the plan based on just one of the three identified needs as too narrow: increasing the availability of lethal prairie dog control tools. In my view, given the need to change management direction, the entirety of the purpose and need statement is reasonable.

The 2020 Plan Amendment process was triggered by changed ecological conditions. The Forest Service's 2015 update to the Black-Tailed Prairie Dog Conservation Assessment and Management Strategy stated that the "management direction contained in the strategy should be reviewed when colonies exceed 35,000 acres." App. Vol. 4 at 18. In 2016–2017, the population exceeded 48,000 acres, and by 2017–2018, it ballooned to more than 75,000 acres.

By its own terms, the 2015 plan was ineffective. The Forest Service recognized the use of nonlethal control methods "proved inefficient and costly," "unsuccessful in addressing encroachment onto private and State lands," and "led to partial inconsistencies between management direction and implementation." *Id.* In 2018, an outbreak of sylvatic plague caused a population collapse, killing 99% of the prairie dog population. The large, interconnected colonies that had developed were particularly vulnerable to the outbreak. The unmanageable boom and bust cycle showed the 2009, 2013, and 2015 management decisions were no longer effective.

We have held that agencies do not create their purpose and need statements in a vacuum. In *Colorado Env't Coalition v. Dombeck*, for example, we approved a purpose

2

and need statement that considered prior and related management decisions, even though the statement was narrow. 185 F.3d 1162, 1175 (10th Cir. 1999). Not only did we hold that the agency *need not* consider its needs in a vacuum, we recognized that it "*could not* consider the proposed Category III expansion in a vacuum." *Id.* (emphasis added).

The parties agree and the majority accepts that the purposes in the purpose and need statement are sufficiently broad. The plan identifies five purposes: "[1] provide a wider array of management options to respond to changing conditions; [2] minimize prairie dog encroachment onto non-Federal lands; [3] reduce resource conflicts related to prairie dog occupancy and livestock grazing; [4] ensure continued conservation of at-risk species; and [5] support ecological conditions that do not preclude reintroduction of the black-footed ferret." Supp. App. at 106.

To further these purposes, the EIS identifies the need to "[1] revise management direction in Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat, [2] adjust the boundaries of management area 3.63 to be more conducive to prairie dog management; and [3] increase the availability of lethal prairie dog control tools to improve responsiveness to a variety of management situations, including those that arise due to encroachment of prairie dogs on neighboring lands, natural and human-caused disturbances, and disease." *Id.* The third need, in the majority's estimation, is so narrow that it precludes consideration of reasonable alternatives. I think this view unduly misinterprets the Forest Service objective.

The need to expand lethal controls logically follows the legitimate purposes set forth in the FEIS. In the Purpose and Need for Action section of the FEIS, the Forest

3

Service explains the changed conditions which triggered the amendment. It states very explicitly "[t]he initial use of nonlethal prairie dog control methods in management area 3.63, as directed in the strategy, proved inefficient and costly, and implementation of the strategy was unsuccessful in addressing encroachment onto private and State lands." Supp. App. at 103. It also stated that contradictions in the plan prevented approved use of rodenticides to manage boundaries for encroachment and resource conflicts. In a joint statement, the Forest Service, U.S. Fish and Wildlife Service, and Wyoming Game and Fish concluded "that the reintroduction of black-footed ferrets on the grassland is not appropriate at this time. Instead, the current focus surrounds prairie dog management actions, including boundary control and disease control." Supp. App. at 104. The plan makes it very clear that to achieve its purposes, lethal control is necessary.

The majority discounts the record to conclude that the Forest Service did not explain why expanding lethal controls was the best option. It skeptically admits that the Forest Service called the nonlethal controls "inefficient and costly" and "inefficient," while ignoring that the same sentence that identifies nonlethal controls as inefficient and costly, identifies them as unsuccessful. Maj. at 18–19; *see* App. Vol. 4 at 18. It rejects the Forest Service's overarching claim that the existing strategy is inflexible and inefficient because the Forest Service had not attempted translocation since 2011, relied on third-party studies about vegetation barriers, and did not use plague mitigation tools during the 2018 epizootic event. Those shortcomings do not undermine the Forest Service's assertion that it could not prevent the prairie dog population from growing so rapidly that it encroached on other lands and became highly vulnerable to the plague.

4

I further disagree with the majority's application of *Fuel Safe Washington*. The majority says the Forest Service was less thorough than the agency there because it did not explain why lethal management is the only viable choice. But in *Fuel Safe Washington*, we approved FERC's purpose and needs because it considered the other alternatives in its no-action alternative. *Fuel Safe Washington v. FERC*, 389 F.3d 1313, 1324 (10th Cir. 2004) ("In discussing a no-action alternative, FERC discussed various other ways to increase electrical power on the island"). The Forest Service does the same here. The no-action alternative would leave the 2009 plan in place and not increase lethal controls. In multiple places throughout the EIS, the Forest Service identifies why it believes the no-action alternative does not achieve its purposes. *See, e.g.*, App. Vol. 4 at 86 ("The no-action alternative does not meet the requirement for having resources in place to conduct boundary control efforts"), 56 ("lack of social acceptance for reintroduction and recurrence of sylvatic plague have prevented reintroduction efforts since 2002"); Supp. App. at 136 ("Encroachment would likely continue onto adjacent private and State lands"); EIS Supp. App. at 124 ("alternative 1 [no-action alternative] would be most expensive to implement, overall.). The Forest Service did consider not increasing poisoning under the no-action alternative, so under *Fuel Safe Washington*, the purpose and need statement is not too narrow.

When considering the entire context of the purpose and need statement, the need to increase lethal management tools follows logically from the changed circumstances and the Forest Service's purposes. And in practice, the Forest Service still considers not

increasing lethal management tools in the no-action alternative. The purpose and need statement does not circumvent considering alternatives, so it is reasonable.

## II.    Range of Alternatives

When an agency defines the purposes of an action "the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not reasonable." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011). The majority rejects the alternatives analysis because the Forest Service does not consider "any alternative that did not increase lethal prairie dog control." Maj. at 23. As I have explained already, the need to expand lethal controls is well established in the record. Once the Forest Service establishes that need, we do not require it to consider alternatives which do not accomplish its goal. Even so, the Forest Service considers keeping lethal controls constant in its no-action alternative. To say that the Forest Service did not consider *any* alternatives which do not increase lethal control is incorrect. It found this alternative did not meet any of its goals and would likely find the same for any other alternative which relied on nonlethal controls. Forcing the Forest Service back to the drawing board to consider more alternatives without increased lethal controls is forcing it to consider alternatives which are "impractical or ineffective." *Colorado Env't Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999).

Even if we hold the Forest Service to a higher standard, the majority cannot identify effective alternatives that should have been considered. The conservation groups suggest that the Forest Service should have considered increasing acreage goals. The EIS did not analyze this possibility in detail, but in rejecting a comment that suggested no

6

acreage objective and maximizing habitat availability, it reasoned maximizing habitat "would decrease the management constraints to a level that would make implementation unpredictable and inconsistent, thus leading to an inability to accurately examine persistence of at-risk species." Supp. App. at 110. This is consistent with the larger management direction change. The large prairie dog populations of 2017 proved difficult to manage, and ultimately lead to collapse. Increasing acreage objective goals would likely harm plague management because "plague epizootics are likely to occur when prairie dog populations and colony extents are high." Supp. App. at 114. Large prairie dog colonies are the cause of the problem, not the solution.

The majority briefly questions the Forest Service's failure to consider reducing or eliminating grazing on the Thunder Basin. Again, the Forest Service explains that it did not explicitly consider this because it need not amend the grassland plan to adjust grazing. The Forest Service can adjust grazing at any time, so this management tool has been available during the ineffective previous plans and would be available under any alternative. It was similarly unnecessary to consider a total ban on grazing because it was outside the scope of the plan amendment.

The majority requires the Forest Service to consider these alternatives because they would have "ensured conservation," Maj. at 25, but "NEPA does not mandate any particular substantive result . . . it prescribes the necessary process that must accompany agency action," *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1179 (10th Cir. 2023) (quoting *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1122 (10th Cir. 2020)).

7

The Forest Service properly considered a reasonable range of alternatives and properly explained why the conservation groups' suggested alternatives did not achieve its goals or fall within the scope of the plan.

### III.    Hard Look

As the majority notes, the APA affords agencies wide latitude, including whether the agency has taken a "hard look." Relevant here, in assessing whether an agency has taken a hard look, we apply only the APA standard, asking whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1034 n.7 (10th Cir. 2023) (quoting 5 U.S.C. § 706(2)(A)). The agency enjoys a presumption of validity, and we uphold an agency action so long as they "examined the relevant data and articulated a rational connection between the facts found and the decision made." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994)). "We will not disturb agency action just because the plaintiff identified deficiencies in an EIS that are mere flyspecks, so long as those flyspecks do not defeat NEPA's goals of informed decisionmaking and informed public comment." *Western Watersheds Project v. Bureau of Land Mgmt.*, 76 F.4th 1286, 1290 (10th Cir. 2023) (internal quotations removed).

The majority highlights one perceived flaw in the Forest Service's analysis and claims this flaw alone undermines its plan. The majority contends that the Forest Service "failed to take a hard look at the *combined impacts* of increased poisoning, increased

8

recreational shooting, and unmitigated plague events on prairie dog populations,

contradicting prior determinations the USFS made in 2009, 2013, and 2015." Maj. 28

(emphasis added). But the entire reason for the 2020 plan amendments was the *changed*

ecological circumstances in Thunder Basin and the conclusion that the previous

management strategies were *inefficient, ineffective, inflexible, and contradictory*. We

should expect agencies to change course when they are correcting failed policies.

To be sure, the majority is correct that the increased poisoning and recreational

shooting of black-tailed prairie dogs is distinct from the Forest Service's decisions made

in previous management plans. But the Forest Service identified that it is shifting its

management direction and focus toward smaller, less volatile prairie dog populations.

The Forest Service stated the following in its effects analysis:

> [w]hile the No Action alternative generally emphasizes the
> growth of prairie dog colonies, changes in management
> direction toward increased use of prairie dog and plague
> control measures as proposed by the action alternatives *could*
> *potentially decrease the volatility of colony size over time*. It
> is possible that managing toward lower colony extents or use
> of density control as described in the Proposed Action and the
> Grassland-wide alternatives could maintain smaller colonies
> and limit the spread of sylvatic plague on the TBNG, but there
> is not currently scientific literature or monitoring data to
> demonstrate support for that hypothesis. Decreased
> management intervention would likely perpetuate the role of
> plague in colony size dynamics, thus, it is important to weigh
> the benefits and costs of black-tailed prairie dog management
> *with the importance of providing well distributed habitat for at*
> *risk species on the grassland*.

EIS Supp. App. at 744 (emphasis added). Thus, what the majority sees an as unexplained

contradiction, is really a reasoned departure from a management strategy that did not

9

maintain stable prairie dog populations or habitat for black-footed ferrets. The record adequately reflects that this decision to shift management strategies is based in the agency's expertise and therefore entitled to deference. *Diné Citizens*, 59 F. 4th 1029–30 ("Our deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.").

The majority also rejects the combined effects analysis, calling it "nothing more than a conclusory statement." Maj. 31 (citation and internal quotation marks omitted). And while the Forest Service's analysis certainly could be more robust, we have stated that "[w]e will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011) (quoting *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)). That bar has been met here. The majority focuses narrowly on the agency's determination that "[w]ith all activities combined, along with resource protection measures and plan components, all alternatives have an effects determination of, 'may adversely impact individuals, but not likely to result in a loss of viability in the planning area, nor cause a trend toward Federal listing,' since the effects are expected be localized." Supp. App. at 236. While this sentence, standing alone, is "of less than ideal clarity," "the agency's path may reasonably be discerned'" *when considering the rest of the FEIS*. *Licon*, 638 F.3d at 1308. The Forest Service bases its determination on the resilience of prairie dogs and localized application of control methods, both of which are well established.

The U.S. Fish and Wildlife service has decided twice not to list the black-tailed prairie dog under the Endangered Species Act "because of its ability to rebound after poisoning, plague, *and* shooting." Supp. App. at 221 (emphasis added). The Forest Service noted that the prairie dogs of Thunder Basin are particularly resilient; the population grew by 400% after it hit a historic low in 2018. Understanding this, the Forest Service concludes that total loss of viability is unlikely.

Finally, the Forest Service explains that it expects the effects from the management tools to be localized. The majority is concerned about the combined effects of poisoning, shooting, and *unmitigated* plague. But as explained above, the new management policy seeks to *mitigate* the plague through smaller, less volatile colony sizes, while also applying the same plague mitigation tools that were available in the previous management decisions. The smaller population, alongside access to more tools, would enable the Forest Service to be more responsive to plague conditions. As the Forest Service explains, plague is the strongest determinant of population reduction; poisoning has more localized effects, and shooting is a minor threat. ECF No. 81 at 2. Indeed, the Forest Service specifically noted, "[a]nthropogenic [man-caused] control efforts have affected prairie dog colony areas to a far lesser degree than plague." Supp. App. 223. Accordingly, it is reasonable to choose the localized effects of poisoning over the catastrophe of plague.

The Forest Service expects the effects to be localized in part because it is entirely in control of poisoning. The preferred alternative prohibits poisoning for more than three consecutive years, foreclosing the kind of systematic, annual poisoning which leads to

complete eradication.  Poisoning is also prohibited when populations are below 7,500 acres and outside the buffer zones.  The Forest Service's goal to maintain a "stable acreage" of prairie dogs would suggest it does not intend to poison in such a way that would risk eradication.  This is consistent with the new management direction, which focuses on stable, less-plague susceptible populations through increased poisoning.  This discernable path the Forest Service laid out supports its conclusion.

The majority's overly narrow focus causes it to miss the broader realities of the Forest Service's decision.  The Forest Service reasonably departed from a previous management scheme that, by its own terms, was no longer working.  Despite the flaws the majority identifies, I would conclude that the decision "was based on consideration of the relevant factors," and there has been no "clear error of judgment."  *Utah Envtl. Cong. v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir.2006).  Under this deferential standard, I would affirm.